[Civil No. 2381. Filed May 21, 1928.]

[267 Pac. 601.]

MARICOPA COUNTY, Plaintiff, v. PIMA COUNTY, Defendant.

Mr. Clyde M. Gandy, for Plaintiff.

Mr. Louis R. Kempf and Mr. K. Berry Peterson, for Defendant.

LOCKWOOD, J.—This is an original proceeding in this court to determine the boundary line between Maricopa county, plaintiff herein, and Pima county, the defendant. There is no serious controversy as to the facts, the real issue being as to the meaning of the words "second standard parallel south," as used by the legislatures of 1877, 1887, 1901 and 1913, in establishing the boundary line between Pima and Maricopa counties.

In 1877 the territorial legislature (Laws 1877, p. 12) established the boundary now in dispute in the following language:

"Thence South along said Eastern Boundary of the County of Yuma to the Second Standard Parallel South; *Thence East on said Second Standard Parallel South* to the East Line of Range No. 1 East."

The particular phrase, the meaning of which will determine this controversy, is the italicized portion of the quotation above. The Code of 1887 re-established all county boundaries, but provided that the re-establishment should be construed merely as a continuation of the laws then in force, and not as a new enactment. The boundary between Pima county and Maricopa county was stated in that Code, as in the act of 1877, as being the "second standard parallel south." In 1901 and 1913 the legislature again re-established the county boundaries, but also provided then that the law so doing should be construed as a continuation of the laws in effect, and not as a new enactment. Where, then, in 1877 was the "second standard parallel south?"

The reference evidently is to the system of land surveys made by authority of the government of the United States. In 1785 Congress established the township six miles square as the unit of public land surveys, and it has so remained to the present time. The original proviso was:

That "public lands shall be divided by north and south lines run according to the true meridian, and by others crossing them at right angles, so as to form townships of six miles square. . . . " 43 U. S. C. A., § 751.

Due to the fact that meridians converge as they approach the north, it is mathematically impossible to comply literally with this provision. Notwithstanding this, Congress has never changed it, but left the matter to the various surveyors-general of the United States to settle as best they could. Jared Mansfield, the surveyor-general in 1803, devised a scheme of primary control consisting of base lines

and principal meridians, but it was discovered that, as the surveys grew in distance from the base line, secondary control lines must be used, and in 1818 the system of standard parallels and guide meridians was introduced. Standard parallels are correction lines run east and west, parallel to the base-line, at stated ·intervals, for the convenience of public land surveys. The distance between them is determined by the Commissioner of the General Land Office, and is stated by him in instructions generally given in the form of a printed manual, and which have been issued periodically since 1855. The distance between standard parallels in any particular survey, however, need not follow the manual, and, if it does not, the rule to be used is announced in special instructions given to the surveyor who makes the particular survey.

At an early date the federal government established at the junction óf the Gila and Salt Rivers the initial monument used for surveys in Southern Arizona. The Gila and Salt River meridian was projected north and south from that point, and the Gila and Salt River base-line east and west. Had the territory of Arizona been surveyed as a unit, the question involved herein would never have arisen, but as a matter of fact the survey was made at many different times and in many fragments. Small portions of the base-line, the standard parallels, and the principal meridian were run at different and separate times. Prior to 1877, the second standard parallel south had been surveyed on the ground only along four townships in Yuma county, one township in Pinal county, and four townships east thereof, but no portion of it had been surveyed along or near the boundary between Maricopa and Pima counties now in controversy. These surveyed portions of the parallel, however, if projected east and west, would have met exactly, and formed a continuous straight line from

the Colorado River on the west to the New Mexico boundary on the east.

In 1893 the second standard parallel south was actually surveyed west of the principal meridian, but, instead of being an extension of the portions of the parallel previously run, it started at the meridian six miles *north* of such projection, and continued to the west along such line until within approximately twelve miles of that portion of the parallel previously surveyed in Yuma county, and then it stopped. The parallel was eventually extended *east* of the principal meridian along the projection of its original line, to the eastern boundary of the state. We thus find at the present time that the second parallel as surveyed on the ground is not a straight line running from one side of the state to the other, but runs due east in a straight line from the principal meridian, beginning at a certain point, while its western extension begins on such meridian six miles to the *north* of the eastern extension, runs west for approximately one hundred and fourteen miles, and then drops south six miles to continue on as an extension of the eastern portion.

It is the contention of Pima county that the government survey, and that only, fixes the standard parallels, and that, when such parallel is located upon the ground, the provision of the statute fixing it by name as the boundary applies to the line as eventually fixed by the survey. Maricopa county claims, on the other hand, that the intention of the legislature must govern in matters of county boundaries, that such intention must be gathered from the circumstances as they existed when the language was first used, and that it is obvious it was the intention of the legislature to fix the boundary at the projection of the parallel as it then existed, since there was nothing to show at that time that the United States would follow any other line than an extension of the already surveyed portions.

We think there can be no dispute that the intention of our legislature must govern. *Hicks* v. *Krigbaum,* 13 Ariz. 237, 108 Pac. 482; *Coggins* v. *Ely,* 23 Ariz. 155, 202 Pac. 391. It named a certain government survey, the boundary line in the particular case, but that designation was used merely as a matter of convenience and for the purpose of establishing a boundary. It could just as well have picked any other natural or artificial line for that purpose. It must be presumed that, when the legislature established the southern boundary of Maricopa county it intended to name a boundary which was or could be exactly determined at the time. It is not conceivable that it meant to choose a line which was undetermined and incapable of determination then, leaving the question of its position in doubt until the occurrence of some future remote contingency. *San Bernardino Co.* v. *Reichert,* 87 Cal. 287, 25 Pac. 692; *Baker Co.* v. *Benson,* 40 Or. 207, 66 Pac. 815. The first-named case involved a question very much like the one at bar. In 1853 the California legislature established the common boundary between San Diego and San Bernardino counties on the line of two named Mexican land grants. Prior to the act establishing this boundary, a private survey of both of these ranchos had been made and placed on record. Nearly thirty years later the land grants were patented, but the United States survey did not follow the private survey above referred to. Some years thereafter the surveyor-general of California started to mark on the ground the boundary between the two counties. In so doing he followed the private survey, disregarding the government survey, which last, of course, was the legal one so far as establishing the actual boundaries of the land grants. A suit was brought to prevent the surveyor-general following the old survey, plaintiff therein contending that the true boundary line fixed by statute was the line of the land grants as de-

termined by the United States government survey. The Supreme Court of California, in discussing the question, said:

"But the Legislature, when in 1853 it passed the said act organizing said county, had power to fix the boundary line wherever it pleased, and for that purpose to adopt any description deemed proper to express its intention. It was the duty—and it certainly may be presumed to have been the intention—of the Legislature to adopt a line that could be then definitely fixed. It cannot be presumed that the intention was to describe a line that could not properly be ascertained until the lapse of some indefinite period, when the United States government, over which there was no control, should see fit, for other purposes, to issue patents for said ranchos, thus deliberately providing for the evils which must certainly come from an unknown and unknowable boundary between two municipal corporations."

We think the logic of this case is unanswerable as to the boundary line originally fixed in 1877. It is inconceivable the legislature meant such line to remain unlocated and unlocatable until the United States government should decide, years later, to run the parallel upon the ground between Maricopa and Pima counties. It must have had in mind a line which was fixed as a matter of law and fixable as a matter of fact on the ground, through the action of its own representatives, without waiting for that of another sovereign. The only reasonable conclusion is that by the second parallel south was meant a projection in a straight line of the portions already surveyed upon the ground, and as fixed by the general instructions given in the surveyor-general's manual then in force, which would be the boundary contended for by plaintiff herein. We are satisfied that such was the boundary line between Maricopa and Pima counties as it existed in 1877.

It is claimed, however, by defendant, that, even though such were the case, when the Codes of 1901 and 1913 were adopted, the second standard parallel south had then been actually run upon the ground, upon the lines contended for by Pima county. In support thereof it cites that provision of the Civil Code which authorizes and empowers this court to take jurisdiction of disputes arising between two counties respecting the location of the boundary line and directs the court to define and designate the true boundary between the counties, and the case of *Yuma County* v. *Maricopa County,* 19 Ariz. 475, 172 Pac. 276. The facts in that case were that the statute fixed the boundary between Yuma and Maricopa counties upon meridian 113 degrees 20 minutes west. Prior to 1889 this meridian had never been marked on the ground. During that year a board of supervisors caused a survey to be made and marked which was intended to be and was then thought to be along the line of the meridian named, but it was later discovered the true meridian was some four miles east of the survey. The court in the Yuma County case said:

"The only direct and positive declaration as to the true boundary line is that it is meridian line 113 degrees 20 minutes west longitude, and we think, when the Legislature later made it the duty of this court to define and designate the true boundary, it meant the boundary line as prescribed by statute. Any other, however long recognized or located, would not be the true boundary. It might be the practical or working boundary as long as acquiesced in or acted upon, and binding to that extent, but it would never be the true boundary, the one fixed by statute, and the one we are enjoined by law to define and designate."

We reaffirm the rule laid down in the Yuma County case, but we think counsel for defendant has mistaken

its true meaning. The legislature fixed the boundary of Yuma county at 113 degrees 20 minutes west. This was a line definitely and mathematically known at the time. It did not require the action of any future authority, either of the state or the federal government, to establish that meridian, either as a matter of law or fact, nor could it be contemplated that the system of geographic meridians used by the entire civilized world would be changed. This court therefore held that the line 113 degrees 20 minutes west was, when the statute was adopted, a definite, fixed location, and that a mere mistake due to the error of some surveyor in marking it on the ground could not affect the true boundary. In this case, however, the words "second standard parallel south" either were indefinite theoretically and unascertainable practically at the time they were first used, or else they applied to a projection of the survey already made. In both cases the legislature intended to fix the boundary on a line which could at that time be definitely located on the ground by officers of the territory. As we have before stated, the only possible place where the line could in 1877 have been definitely located from the language of the statute was on the boundary contended for by plaintiff herein. The section of the Code cited by defendant only authorizes us to determine where the legislature fixed the boundary line, not to fix one of our own initiative.

Believing as we do that in 1877 it was the intention of the legislature to fix the boundary line between Pima and Maricopa counties on the projection of that portion of the second standard parallel south then surveyed, and that it has never since changed such boundary, the plaintiff's contention is correct, and judgment necessarily follows that the true boundary between Maricopa and Pima counties is along the projection of those portions of the second standard

parallel south which were surveyed upon the ground in 1877.

Judgment for plaintiff.

ROSS, C. J., and McALISTER, J., concur.