665 P.2d 1081

**Robert W. CORDWELL and Dorothy W. Cordwell, husband and wife, Plaintiffs-Respondents,**

v.

**James SMITH and Teresa Smith, husband and wife, et al., Defendants-Appellants.**

No. 13970.

Court of Appeals of Idaho.

June 7, 1983.

Petition for Review Denied
Aug. 4, 1983.

Richard Wallace, Coeur d'Alene, for appellants.

Samuel Eismann, Coeur d'Alene, for respondents.

## ON DENIAL OF PETITION FOR REHEARING

SWANSTROM, Judge.

The Cordwells brought this quiet title action to extinguish the claims of defendants who were asserting a right to use certain roadways crossing the Cordwells' property. The defendants contended that the roads provided the only reasonable access to their nearby properties. The trial court found that only one defendant had acquired a right to cross the Cordwells' property, and entered a judgment quieting title in the Cordwells against the claims of the other defendants. Not all of the defendants chose to appeal from the judgment. Only those who did are listed in the caption of this opinion.

The issues raised by appellants are: (1) Was the trial judge correct in concluding that there was no public roadway across the Cordwells' property as the result of prior use and expenditure of public funds for maintenance? (2) Did the court err in concluding appellants had not acquired easements by implication either from (a) apparent continuous use or (b) as a way of necessity? (3) Did the judge err in refusing post-trial requests of appellants that he (a) view the alternate access route and (b) permit appellants to reopen the trial so they could put in proof concerning estimated costs of improving and maintaining the alternate access road for year-round travel? Because we find no reversible error in the trial court, the judgment quieting title in favor of the Cordwells is affirmed.

The record shows the following background facts. The Cordwells own about three hundred twenty acres at the bottom of Little Baldy Creek Canyon in Kootenai County, Idaho. The property is located a few miles south of Interstate Highway 90 near the towns of Cataldo and Kingston. There is a public road leading from the Interstate at Cataldo southwesterly to Latour Creek where it crosses a northern corner of the Cordwell property. The Cordwells use this Latour Creek public road to reach their lands.

There is another, more circuitous way to Little Baldy Creek Canyon, over a system of roads beginning at Kingston. A public road from Kingston goes up French Gulch in a southerly direction, thence westerly to the vicinity of Frost Peak. Frost Peak lies a few miles to the south of the Cordwell property, above the head of Little Baldy Creek canyon. An old logging road—called the Nordstrom road—leaves the public road in the vicinity of Frost Peak and descends northward through the steep forested canyon, onto the Cordwell lands, where it joins the Latour Creek road on the northern corner of the property. We will call this way the French Gulch route.

The Nordstrom road and two other old logging roads come together on the Cordwell property near the Latour Creek county road. One, the Mack road, runs easterly from the fork. The other two, the Ladd road and the Nordstrom road generally parallel Little Baldy Creek. These three roadways are the focus of this lawsuit. They were built and extended at several times, starting about 1930, as haul roads for the timber that was logged from the canyon.

Appellants own various small parcels of land to the south and east of the Cordwell property. They assert a right to use the Ladd, Mack and Nordstrom roads across the Cordwell property in order to gain access to their properties from the Latour Creek county road. On the other hand, the Cordwells claim ownership of the roads, contending that the roads are private, and that appellants have no right to use them.

All three of the roads were, and still are, narrow, one-lane, primitive mountain roads. They were built by loggers and were named after the persons who helped in their construction. There was testimony that the Mack road was built in 1930 by Mack so he could log timber along the road. There was other testimony that the Ladd and Nordstrom roads were started in 1934 by Ladd and finished later by Nordstrom in the 1940's.

The part of the Cordwell property through which the three roads run was once owned by Ole Ladd and his wife. Ladd, a logger, at one time lived on Little Baldy Creek. Ladd constructed some of the roads; and he permitted other loggers to use them and to build additions to them. Nordstrom was one such logger. Over the years as the logging progressed, he pushed the Nordstrom road higher up the canyon until it eventually met the public road near Frost Peak. In 1946 Ladd charged Nordstrom ten cents per thousand board feet for the privilege of logging over the Nordstrom road. As a result of this logging activity there are many old spur logging roads branching off the Nordstrom road above the Cordwell property.

By 1950 Ladd had acquired other lands in Little Baldy Creek Canyon to the south and east of what is now the Cordwell property. In 1951 Ladd sold the 320 acres on the east to Russell & Pugh Lumber Company. In March, 1954, Ladd sold 280 acres on the south to the same purchaser. Finally in July, 1954, he sold all of his remaining property to buyers named Turcottes. This latter piece, some 240 acres, went through a series of subsequent transfers, until it was purchased by the Cordwells in November, 1968. No mention was made of access roads in any of the original conveyances by Ladd.

The first two parcels sold by Ladd in 1951 and 1954 to Russell-Pugh went through several later transfers. The subsequent owners divided these tracts and some adjacent property into pieces and advertized them for sale in a national sporting magazine. Some pieces were as small as ten and twenty acres. The appellants were among those persons who responded to this advertising and who purchased small tracts to the south and east of the Cordwell property in 1969 or the early 1970's. The trial judge found that all of the appellants, except one, acquired their properties "sight unseen." Most of the appellants testified to a belief that the Nordstrom road was a public road, but none of them had inquired about the validity of the access to their property over the roadways in question.

The Cordwells, on the other hand, who bought their property in two separate purchases in 1968 and 1969, have always insisted that the so-called Mack, Ladd, and Nordstrom roads on their property were private. The Cordwells did not live on the property. They attempted to control the use of the roads by others by installing a locked gate on their property near the Latour Creek road but these efforts were ineffective. They had a caretaker for a time in an attempt to curtail trespassing and vandalism.

When the appellants and others continued to assert a right to use the roads, the Cordwells brought this action to quiet title. The defendants filed counterclaims setting forth several theories to support their claims of right to use one or more of the three roads. As noted above, when the trial court ruled against all defendants but one, this appeal followed.

I

Appellants assert that the trial court erred in failing to hold that the Nordstrom road had become a *public* road, due to its use by the general public for a period longer than five years, coupled with the expenditure of public funds for its maintenance.[1] Idaho Code § 40–103 provides in part as follows:

1. Appellants also sought to prove at trial that they had acquired *private prescriptive* easements. However, the trial court found that they failed to prove adverse use for the five-year time required. Appellants have not contested this ruling on appeal.

Roads laid out and recorded as highways, by order of the board of commissioners, and all roads used as such for a period of five (5) years, provided the latter shall have been worked and kept up at the expense of the public, or located and recorded by order of the board of commissioners, are highways.

Appellants do not contend any of the three roads were ever "laid out and recorded as highways." However, that is not necessary before they can become public roads. All that is necessary is that a road be used by the public for five years or longer and that they be "worked and kept up at public expense." *State v. Nesbitt,* 79 Idaho 1, 6, 310 P.2d 787, 790 (1957).

It is not disputed that the Idaho Department of Public Lands has conducted timber sales, forest management practices, and fire suppression activities in the area of Little Baldy Creek drainage. Appellants established that during the ten years preceding the trial (1970–80), the department expended public funds, estimated at $100 per year in the value of labor and equipment, to maintain the Nordstrom road. This maintenance consisted of opening culverts, clearing brush and fallen trees, and occasionally grading the road surface.

It was also undisputed that for many years members of the general public have traveled on the Nordstrom road from the Latour Creek road and have crossed what is now the Cordwell property for the purpose of hunting, recreation, and woodcutting. The evidence shows that the owners of the Cordwell property gave permission to some people for such uses. Other users testified at trial they believed the road to be public and obtained permission from no one. Some users testified to encountering a gate or cable across the lower road but they went through anyway.

Appellants contend that their proof of the use of the Nordstrom road by the public for over five years and the expenditure of public funds in its maintenance is sufficient, under the ruling in *State v. Nesbitt, supra,*

to establish that the road is public. The trial court disagreed, and so do we.

The trial court found that the state's use of labor and equipment on the Nordstrom road was done largely to provide the state with access into the area in the event of forest fires. It also gave the state more convenient access to its own timber lands in the area. The state, however, did not assert any public ownership or control over the road through the Cordwell property. Neither the county nor any other public agency claims the road to be public. On the contrary, the state specifically sought and obtained the Cordwells' written permission to use the road for its limited purposes. It also entered into right-of-way agreements with the Cordwells, allowing loggers of state-owned timber to use the road. As part of the consideration for these agreements, the state made certain improvements or repairs to the road, and agreed to keep the gate on the property shut when not in use.[2]

If we were to say under these circumstances that because public funds were expended on the road, it has become public, it would undermine the whole purpose of the agreements between the Cordwells and the state. By the expenditure of public funds the state never intended to create any greater public right to the road than was granted by the Cordwells. It is presumed that the state received the benefits for which it contracted. Under these circumstances, we do not believe that I.C. § 40–103—as construed in *Nesbitt, supra*—would apply.

We hold that where the public agency expending funds on a roadway expressly recognizes the private character of the road, and does not intend to create or to assert any rights greater than those allowed by the owner of the roadway, I.C. § 40–103 does not operate to make the road public. The trial court did not err in determining that the Nordstrom road was private.

2. Neither the state nor any other public body was named as a party defendant in the complaint. Consequently, the state has not appeared in this action.

## II

■ We next consider the assertion that the trial court erred in ruling appellants had not acquired right-of-way easements by *implication.* There are two types of such "common law" easements. They may arise where the owner of property severs it and—without making provision by deed for access—conveys a part in such a manner that either the part conveyed or the part retained is cut off from a public road.

One such implied easement may be termed an easement from apparent continuous use. It relates to an existing private roadway which was in "apparent continuous use" by the common owner before the severance. The second type of implied easement is a "way of necessity." This easement, as the term suggests, arises strictly from necessity and does not depend upon the prior existence of a roadway in apparent continuous use.[3]

■ The creation of either type of implied easement rests upon exceptions to the rule that written instruments speak for themselves. Because implied easements are in derogation of this rule, they are not favored by the courts. Those who assert the existence of an implied easement have the burden of proving facts which establish it. *Davis v. Gowen,* 83 Idaho 204, 360 P.2d 403 (1961). *See also Wagner v. Fairlamb,* 151 Colo. 481, 379 P.2d 165 (Colo.1963), *cert. denied* 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 110 (1963).

### A

We will first discuss the appellants' claim of an implied easement arising from apparent continuous use. In *Davis v. Gowen, supra,* our Supreme Court stated the essentials to be as follows:

To establish an easement by implication in favor of the dominant estate, three essential elements must be made to appear;

(1) Unity of title and subsequent separation by grant of dominant estate;

(2) Apparent continuous user;

(3) The easement must be reasonably necessary to the proper enjoyment of the dominant estate.

83 Idaho at 210, 360 P.2d at 406–07.

■ In the later case of *Close v. Rensink,* 95 Idaho 72, 501 P.2d 1383 (1972), our Supreme Court noted a four-part test set forth in *Wagner v. Fairlamb, supra,* and in 1 G.W. Thompson, Real Property, § 396, p. 647 (perm. ed. 1939). However, the court said that "even though the phraseology of the requirements, as set out in *Davis v. Gowen, supra,* is somewhat different from that discussed in 1 Thompson § 396, the same principles are involved." 95 Idaho at 76, 501 P.2d at 1387. For this reason we will apply the three-part test of *Davis v. Gowen, supra,* to the evidence in this case.

Appellants assert that in 1950–51, when Ole Ladd owned 840 acres in Little Baldy Creek drainage, the three roads in question provided access to the various parts of Ladd's property. Appellants contend that when Ladd—the former common owner—conveyed two parcels to Russell & Pugh Lumber Company in 1951 and in 1954, easements by implication over the existing roadways were created in favor of each parcel conveyed. The district judge accepted appellants' proof that there once had been a "unity of ownership" followed by a "separation" of dominant and servient estates.

■ However, our view of the record discloses that some appellants are claiming easements to lands that were never part of Ole Ladd's holdings. An easement by im-

---

**3.** By statute Idaho recognizes yet another implied easement. Idaho Code § 55–603 provides:

A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred, in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed.

The effect of this statute was not discussed at trial or on appeal. Because no issue has been raised relating to this statute, we have no occasion to discuss it further.

plication can only arise as to the lands owned and severed by the former common owner. *See Close v. Rensink, supra,* 95 Idaho at 77, 501 P.2d at 1388. The parcels owned by appellants Fairbanks, Dotson, Sherick, and Long are all located in the east half of Section 17, Township 48 North, Range 1 East. Appellant Livich owns one parcel in the east half of Section 17 and another parcel, some distance away, in the west half of the section. Ole Ladd owned no property in the east half of Section 17. It is clear that no easement by implication arose as to any of the parcels located in the east half of Section 17. To this extent we agree with the Cordwells' contention, that no unity of ownership was proven. The district judge erred, but it was an error that benefited rather than harmed these appellants. The district judge's finding was correct with respect to the parcels located in the west half of Section 17, which are owned by Mathis, Livich, Solido, Smith, Schafer, and Smock. It was also correct as to the parcels owned by appellant Coyne in the northwest quarter of the southwest quarter of Section 8, Township 48 North, Range 1 East.

■ We next examine whether those appellants who did meet the unity of title test also met the second requirement—a showing of "apparent continuous user." We gather, from the discussion of this requirement in *Close v. Rensink, supra,* that "apparent continuous user" refers to use *before* separation of the lands. That is, the common owner must have used the premises and the system of roadways long enough to show that the roadways were intended to provide permanent access to those lands which are later severed.

The district judge's findings, accurately summarizing the evidence, are not disputed. They show that all of the roads in question were originally constructed to haul logs from the Ladd property. The judge found "no evidence or presumption that they were to remain as permanent access roads." Most of the logging was done between 1930 and 1952. Mack, Ladd, and Nordstrom probably completed all logging use of the roads prior to 1953.

There is no evidence of the use of these roads by any of the appellants' predecessors in interest between 1951, when Ladd sold the first of two large tracts to Russell-Pugh, and 1969, when some of the appellants began acquiring smaller parcels of the same property. More importantly, it has not been shown that once Ladd completed his logging in the area, he used the roads for any purpose except to reach his home. His home was located on the tract of land he sold last, the one ultimately acquired by the Cordwells. Thus, at the times Ladd severed his ownership of the whole 840 acres, there was no continuous use being made of the roads leading from the parcel he retained and occupied to the parcels he conveyed to Russell-Pugh.

■ There also was no evidence to show what use, if any, Russell-Pugh made of the property during the ten years that it retained ownership before selling to subsequent owners who started subdividing the property. The trial court found that the only intervening use of the roads since 1953, shown by the evidence, was by hunters, woodcutters, berry pickers, and snowmobilers—all either trespassers or strangers to appellants' chain of title. We hold that the trial judge was correct in concluding that none of the appellants acquired easements by implication from "apparent continuous use" of the roads across the Cordwells' property. They failed to prove that the use made of the roads, before separation took place, was of a type and duration sufficient to satisfy the "apparent continuous user" test. Having reached that conclusion concerning this requirement, there is no need to discuss here whether the third part of the test for this type of implied easement was met by appellants.

■ We turn next to appellants' assertion that they have an implied easement by "way of necessity." Such necessity can arise when the owner of land conveys part thereof to another, and the part conveyed is without ingress or egress except over the lands retained. *Wagner v. Fairlamb, supra;*

*Martino v. Fleenor,* 148 Colo. 136, 365 P.2d 247 (Colo.1961). The Idaho Supreme Court, quoting from *Martino,* and from 17A Am. Jur. 668–69, Easements, § 58, said in *Burley Brick & Sand Company v. Cofer,* 102 Idaho 333, 335, 629 P.2d 1166, 1168 (1981):

Although a way of necessity is sometimes confused with an easement arising, on severance of title, from a pre-existing use, there is a definite distinction between them, mainly because a way of necessity does not rest on a pre-existing use but on the need for a way across the granted or reserved premises. A way of necessity is an easement arising from an implied grant or implied reservation; it is a common-law origin and is supported by the rule of sound public policy that lands should not be rendered unfit for occupancy or successful cultivation. Such a way is the result of the application of the presumption that whenever a party conveys property, he conveys whatever is necessary for the beneficial use of that property and retains whatever is necessary for the beneficial use of land he still possesses. Thus, the legal basis of a way of necessity is the presumption of a grant arising from the circumstances of the case. This presumption of a grant, however, is one of fact, and whether a grant should be implied depends upon the terms of the deed and the facts in each particular case.

A way of necessity arises where there is a conveyance of a part of a tract of land of such nature and extent that either the part conveyed or the part retained is entirely surrounded by the land from which it is severed or by this land and the land of strangers. It is a universally established principle that where a tract of land is conveyed which is separated from the highway by other lands of the grantor or surrounded by his lands or by his and those of third persons, there arises, by implication, in favor of the grantee, a way of necessity across the premises of the grantor to the highway.

▉Thus, appellants here had the burden of proving they met three requirements: first, that their properties were once part of the larger tract held under one ownership prior to a division of the tract; second, that a necessity for the roadway existed at the time of the severance; and third, that the present necessity for the particular right-of-way is great. *Close v. Rensink, supra, Wagner v. Fairlamb, supra,* 379 P.2d at 168; *Martino v. Fleenor, supra,* 365 P.2d at 249.

As noted earlier, the trial court erred in finding that *all* appellants had met the first requirement of "unity of title" by a predecessor in interest. Some had not. As to the remaining appellants, the question is whether they proved that "necessity" existed at the time of severance and at the time of the lawsuit, and that the necessity was "great."

▉Concerning these two requirements, it should be reemphasized that the existence of a way of necessity does not depend upon what use the common owner was making of the roads existing at the time of severance. Such easement could arise even if at the time of severance there was no road across the grantor's property to the part conveyed. Thus, a remote grantee of land not being used at the time of severance—as in the present case—may nevertheless, when the use becomes necessary to the enjoyment of his property, claim the easement under this remote deed. *Hancock v. Henderson,* 236 Md. 98, 202 A.2d 599, 603 (Md.1964).

▉A way of necessity arises from public policy considerations. It is, literally, a creature of necessity. The necessity must exist at the time of the severance by the common owner, and the person claiming such an easement must also show there is a present necessity for it. Once established, a way of necessity exists only so long as the necessity lasts, for it is the policy of the law not to burden a servient estate more or longer than is necessary.

▉The trial court made no finding of necessity at the time of severance. Rather, the court noted, "There is no evidence or presumption that . . . [the Mack, Ladd, and

Nordstrom roads] were to remain as permanent access roads." In any event, it cannot be presumed that the present owners have the same necessity for access roads which might have existed at the time of severance. When lands have been severed, the grantee—or his successors in interest—cannot, by subdividing, create a new and different "necessity" for rights-of-way, where no such necessity existed before the severance. *See* 2 G.W. Thompson, Real Property, § 373, p. 398 (repl. 1980); *Gulotta v. Triano,* 125 Ariz. 144, 608 P.2d 81 (Ariz.App. 1980); *Lankin v. Terwilliger,* 22 Or. 97, 29 P. 268 (Or.1892). A remote grantee cannot create the necessity upon which he relies. If the way of necessity was not implied at the time of the grants by Ladd in 1951 and 1954, it cannot be established by a subsequent necessity arising out of subdividing or other changed circumstances. *Hancock, supra,* 202 A.2d at 603.

Moreover, the "present" necessity must be great. The case of *Wagner v. Fairlamb, supra,* lends some meaning to the word "great" as it qualifies the degree of present necessity required. That case involved access to one-half of a mining claim in steep, mountainous, rocky country. Half of the land relating to the claim had been sold by a former owner of the whole claim, with the result that the half conveyed had no roadway access except through the half retained. The court noted that in such country "roads at best are hazardous, expensive and dangerous to build." From documentary evidence the court held that the plaintiffs' road "as now constructed is under all the circumstances the only practical method of affording ingress and egress for the purpose of mining or otherwise using the south half of the [claim]." The trial court, based on conflicting evidence and its own view of the area during the trial, had found the road was necessary then, and that the necessity existed in 1919 when the claim had been severed. The Colorado Supreme Court agreed, saying:

> In this connection we take cognizance of the fact that some authorities have held that a way of necessity cannot exist merely because the land is too steep or

too narrow for a reasonable route.... We hold that the rule as applied to property like this means a practical inability to have access any other way than by a way of necessity.... For this purpose the law assumes that no person intends to render property conveyed inaccessible for the purpose for which it was granted. And, of course the reverse is also true, i.e., that he does not intend to render lands retained inaccessible.

379 P.2d at 168–69.

A similar standard has been followed in Idaho under statutes which permit individuals to condemn access roadways across private and public lands from "highways to residences and farms." I.C. §§ 7–701(5) et seq. *See e.g., Erickson v. Amoth,* 99 Idaho 907, 591 P.2d 1074 (1979); *McKenney v. Anselmo,* 91 Idaho 118, 416 P.2d 509 (1966); and *Eisenbarth v. Delp,* 70 Idaho 266, 215 P.2d 812 (1950). In *Erickson,* the Idaho Supreme Court said:

> The burden of proving necessity for taking land is upon the condemnor, but he need only prove a reasonable and not an absolute, necessity.... It was then incumbent upon the Ericksons to prove that the alternative means of access were not available to them or that such means of access were not reasonably adequate or sufficient for their purposes.

99 Idaho at 910, 591 P.2d at 1077.

 Where a person claiming a way of necessity to a piece of property has other adjoining lands that abut on a public way, he may not be entitled to a way of necessity across lands of his grantor or across lands of strangers except in cases of "strict" necessity. *Close v. Rensink, supra,* furnishes an example of this situation. *See also Gaines v. Lunsford,* 120 Ga. 370, 47 S.E. 967 (Ga.1904); and *Tucker v. Nuding,* 92 Or. 319, 180 P. 903 (Or.1919).

 However, the degree of necessity is not so great where the lands of the person claiming a way of necessity are entirely cut off from access to a public way by the grantor's lands and by lands of strangers. In such a case the general rule is that the

claimant need only establish a reasonable necessity for the claimed route. *Wagner v. Fairlamb,* 379 P.2d at 168; *Ashby v. Justus,* 183 Va. 555, 32 S.E.2d 709 (Va.1945); *Crotty v. New River & Pocahontas Consol. Coal Co.,* 72 W.Va. 68, 78 S.E. 233 (W.Va.1913). This standard for the degree of necessity required is comparable to the standard used in the Idaho private condemnation actions. *Erickson, supra; McKenney, supra;* and *Eisenbarth, supra.* The Supreme Court of Washington has also employed a similar standard in private condemnation actions, noting that the degree of necessity should be the same as that required in determining the existence of implied ways of necessity. *State ex rel. Carlson v. Superior Court for Kitsap County,* 107 Wash. 228, 181 P. 689, 692 (Wash.1919). We agree.

█ In summation, we hold that the legal burden which each appellant had to carry on the issue of necessity was to establish by competent evidence that the route across the Cordwells' property was at the time of severance—and still is—the only reasonable means of access to the property of each appellant. Necessarily, this means proving that the French Gulch route was not reasonably adequate. Mere inconvenience would not suffice. Substantial inconvenience may be an important factor, but it must be weighed against the inconvenience and possible damage that could result to the Cordwells as a result of imposing an easement across their property. As was said in *Eisenbarth v. Delp,* 70 Idaho at 270, 215 P.2d at 814:

> [It is for the trial court] to balance the relative situations pro and con . . . as to the respective convenience, inconvenience, costs and all other pertinent connected facts . . . in determining whether a reasonable necessity exists for the taking of respondents' land, in view of the fact appellant already has a right-of-way, though longer.

█ Whether an alternate route constitutes a reasonably convenient way is a question of fact to be determined from the evidence. *Id.* Findings of fact will not be set aside on appeal unless they are clearly erroneous. I.R.C.P. 52(a).

The trial court, "after weighing the pros and cons of each access," reached the conclusion that the French Gulch route provided appellants with reasonable access to their properties. He held they were not entitled to a way of necessity across the Cordwells' property. We are satisfied that the trial judge understood and applied the correct legal standard. We now examine whether his finding, that the French Gulch route provided appellants with reasonable access to their properties, was supported by substantial and competent evidence.

Two of the original defendants in this case, Coyne and Roush, asserted the right to use the Mack road. The court found in favor of Roush, but not Coyne. Coyne has appealed, but we note that she did not testify at trial, and no evidence was produced to show what necessity she had to use the Mack road. We will not disturb the holdings of the trial court in regard to these parties.

We focus our attention on the Nordstrom road, which is the subject of the other appellants' claims of easements by necessity. The trial judge determined, in essence, that these appellants had proven no present, great necessity to use the lower, northern end of the Nordstrom road, where it crosses the Cordwells' property, because the upper, southern end of the road provides access to each of the appellants' properties through the French Gulch route. In reaching this determination the trial judge made findings which we summarize as follows.

The northern end of the Nordstrom road is generally a one-lane road, consisting of native material of rock, dirt, and sandy loam. It has a gradual grade. The segment of the road crossing the Cordwells' property, from the gate at the lower end to where it leaves the Cordwell land, is approximately three-fourths of a mile. It is about five miles from the gate—via the Latour Creek county road—to Interstate Highway 90, near the Cataldo Mission.

The southern end of the Nordstrom road begins a steep ascent as it leaves the Cord-

wells' property. It also is a one-lane, mountainous road, slippery when wet. The upper end is steep and rocky but driveable at all times except in winter months when the snow depth is heavy or the road is wet. The upper end connects with a public road near Frost Peak. The road, from the Cordwell boundary to the top, is about four miles. It is another 9.4 miles from the top down the French Gulch public road to the Kingston exit on Interstate Highway 90.

Neither the southern end nor the northern end of the Nordstrom road has been maintained or snowplowed in the winter months. The evidence indicates that the upper end of the French Gulch road—in the vicinity of Frost Peak—also has not been kept open for vehicular traffic in the winter months. We have already mentioned that the state, each spring for several years, has cleared the Nordstrom road of fallen timber and brush and provided minimum maintenance for timber management and fire suppression purposes, by agreement with the Cordwells. There was undisputed testimony at trial that while loaded logging trucks could be—and were—driven down the Nordstrom road, they could not be driven up to the top because of the steepness of the grade and the condition of the road.

The area where appellants' tracts are located is steep, mountainous, forested country. The evidence shows that, until appellants purchased these scattered tracts there was no asserted need for year-round access to the area. None of the old logging roads beyond Ole Ladd's dwelling were kept open in the winter. With the exception of the Roush tract—not at issue in this appeal—none of the tracts has been occupied nor improved.

When weighing the relative convenience and practicality of the Cordwell road and the French Gulch route, the trial judge was faced with the undisputed fact that neither route would afford convenient, dependable access during several months of winter each year to many of the tracts involved in this suit. It would be necessary, with either route, to expend considerable money and effort in order to have year-round access by wheeled vehicles. Although many appellants apparently bought their property "site" unseen, they must have been aware they were purchasing property at a location, and in a climate, where there would be limited utility and access during the winter months.

 In conclusion, the uncontroverted record shows that access through the Cordwell property would be easier, but both routes are presently available in fair weather and both are unavailable or treacherous during the winter. In view of this evidence, we hold that it was not clearly erroneous for the trial judge to find appellants had proven no present, great necessity to cross the Cordwell property. Therefore, we sustain the judge's determination that there was no easement by necessity.

### III

 Finally, we examine the contention that the trial judge erred in not allowing appellants to reopen their case, to take a view of the French Gulch route, and to admit additional evidence concerning costs of improving and maintaining the alternate route. Appellants' motion to reopen the trial came after post-trial briefs had been submitted and after the judge had issued his memorandum opinion. While perhaps the judge still could have granted such a motion at that stage of the proceedings, it would approach the limits of discretion to do so. Some photographs of the French Gulch route already had been introduced in evidence. The trial judge had those exhibits and a considerable amount of testimony about all of the roads in question. A personal view of the area by the judge during the proceedings, while appropriate, was not essential to a fair or complete trial. I.R. C.P. 43(f).

 Regarding appellants' desire to show the cost of improving the French Gulch route, the trial judge already had recognized that providing year-round maintenance of the this route would be expensive and difficult. The record suggests that it would also be difficult and expensive to

provide year-round access to the various tracts from the Latour Creek side. Appellants' proffered evidence would merely have quantified what the judge had already recognized in regard to the French Gulch route. We hold that the judge did not abuse his discretion in refusing to reopen the trial for the requested purposes.

We affirm the judgment. Costs to respondents, but no attorney fees will be awarded.

WALTERS, C.J., and BURNETT, J., concur.