751 P.2d 98

Thurlo H. FRENCH and Dorothy French, husband and wife, Plaintiffs/Appellants, Cross–Respondents,

v.

Carole K. SORENSEN and Rick Sorensen, husband and wife, and individually, Defendants/Respondents, Cross–Appellants.

David SCHOONEN and Helen B. Schoonen, husband and wife, Plaintiffs/Appellants,

v.

Carole K. SORENSEN and Rick Sorensen, husband and wife, and individually, Defendants/Respondents.

Nos. 16398, 16399.

Supreme Court of Idaho.

Feb. 10, 1988.

Elam, Burke & Boyd, Boise, for appellants French. Carl P. Burke argued.

Anderson, Pike & Bush, Idaho Falls, for appellants Schoonen. Douglas R. Nelson argued.

Steven J. Millemann, McCall, for defendants/respondents, cross-appellants.

BISTLINE, Justice.

This appeal concludes lengthy litigation over the Robinson Bar Road near Stanley, Idaho. Upon review of Judge Beebe's able memorandum decision, we find that it admirably states the facts and applies the law. We adopt it as our own with additional discussion supplied in footnotes:

"The case centers upon a .8–mile stretch of road extending across land of Sorensen (Robinson Bar Ranch). The stretch was part of a segment of a historic road which segment was on the south side of the Salmon River. The segment is known as Robinson Bar Road. The historic road was from Clayton to Stanley. Its inception in the segment was upon federal lands and predated the patent of Robinson Bar Ranch to Chase A. Clark. The .8–mile stretch of road was not excepted from the patent. (An unusual intrusion on ordinary symmetry appears in the patent as a rectangular strip of federal land about 33 feet wide protruding from the federal government's warm springs area to the south into the Robinson Bar Ranch to an end line proximate to the stretch of road within the ranch; hereinafter instrusion.) Over the years, the historic road became known as State Highway 75. In early 1939, the segment was replaced by construction of a new segment on the north side of the Salmon River in connection with modernization of the entire highway between Stanley and Challis. Custer County, on May 16, 1939, ordered abandonment of most of the replaced segment and published the record of its action in the May 24, 1939, issue of the Challis Messenger, a weekly newspaper published in Challis. The replaced segment commenced upstream at a bridge near Mulley Creek; proceeded 2 miles to the ranch; .8 miles through the ranch; and 7.6 miles downstream to Slate Creek. Warm Springs Creek is just within the upstream boundary of the ranch. The abandoned portion was from Warm Springs downstream to Slate Creek.

"Since the order of abandonment, Custer County has accomplished no work on the segment known as Robinson Bar Road. The county determined to abandon the portion of the segment in May, 1939, and has since (up to September 1981, when it declared the road to be a public road) acted accordingly. There was an abandonment in fact, and substantial compliance with the provisions of then I.C. 40–501.

"Under the law, the abandonment caused extinguishment of the public nature of the road. Title to the land involved in the abandoned road became fee simple in the owners of the land abutting the roadway. The only road rights which could exist would be private, not public.

"The issues of the case commence with the abandonment of the portion from Warm Springs to Slate Creek.

"The action stems from the county's September 16, 1981, declaration that the road is a public road and a quiet title action against the world (except the United States of America) based on said declaration to establish the road as public. The county's declaration was premised upon:

"1. The maintenance of the road since June, 1939 was by the Forest Service and its subunit, Sawtooth National Recreation Area; hence, a road worked and kept up at the expense of the public;

"2. The public has used the road as a highway since its abandonment in June, 1939.

"3. I.C. 40–202 (formerly I.C. 40–103) which read:

" 'Recorded and worked highways.— Roads laid out and recorded as highways, by order of a board of commissioners, and *all roads used as highways for a period of five (5) years, provided they shall have been worked and kept up at the expense of the public,* or located and recorded by order of a board of commissioners, *are highways.* Whenever any corporation owning a road or bridge is dissolved, or discontinues the road or bridge, the bridge or road becomes a highway.' (Emphasis added).

"The individual plaintiffs are aligned with the county. In their separate actions they claim alternatively:

"1. The stretch of road is public:

"a. perforce I.C. 40–202;

"b. perforce 43 U.S.C. 932.

"2. Plaintiffs each have private easements.

"The private plaintiffs do not have their claims to private easements consolidated in this cause.[1]

"The United States of America (Forest Service) has not submitted to jurisdiction of this court for adjudication of any of its rights. Thus the court will be viewing relevant Forest Service rights, conduct, and intentions in connection with the use and maintenance of the abandoned road; but not adjudicating such rights. At some point in time, the road acquired a Forest Service road designation of 70454. The 2-mile stretch from the upstream bridge, Mulley Creek, to the ranch was 70454(1); the .8–mile ranch stretch was 70454(2); the 7.6 mile stretch downstream to Slate Creek was 70454(3).

"Since the Forest Service was the owner of the land on which two stretches existed, separated by the ranch-owned stretch, we will be viewing the stretches as units. Also, since the 'public easement' statute, I.C. 40–202, (formerly I.C. 40–103) and the 'abandonment by non-use' statute, I.C. 40–203 (in part formerly I.C. 40–104) deal in ... 'a period of five (5) years ..'; issues will also involve time periods.

"The ultimate facts will be whether or not for any five year period the road across the ranch was used as a highway and was worked and kept up at the expense of the public; and if so, whether thereafter the road was not worked or used for a five year period.

"There is more to the law than meets the eye by a reading of I.C. 40–202. Justice Bakes' opinion in *Tomchak v. Jefferson County* [108 Idaho 446], 700 P.2d 68 (1985) averted to the extensive variations of circumstances that can be encountered in a dispute concerning application of the public easement aspect of I.C. 40–202. It appears from a reading of other cases, commencing with the old and proceeding to the more recent of the Idaho Supreme Court and Idaho Court of Appeals concerning public acquisition of road easements, that there has been a change of thinking; from, simply, public funds expended for maintenance, plus public use, equals public prescription—to more complex inquiries, including:

" '... frequency, nature and quality of the public's use and maintenance of the road and the intentions of the landowners and county relevant to the use and maintenance.' *Tomchak*, supra, [700 P.2d] at 70.

▪ "In a case such as the one at bar, wherein property is sought to be taken or confirmed as taken, consideration of the intentions of the public agency expending funds and of the landowner relevant to the use and maintenance is necessarily the min-

---

1. See summary judgment decision, *infra*, p. 958, 751 P.2d p. 106, on the private easement claims.

imum substantive due process of law requires. To elucidate: were the Federal Government to assert it had adversely acquired rights to the road across the ranch, it would be required to pay just compensation. See: *United States v. Wood*, 466 F.2d 1385 (9th Cir.1972). It is thought an underlying basis for a 'taking' by a state entity under I.C. 40–202 is that the expenditure of public funds on such road is compensation. The Idaho Court of Appeals stated in *Cordwell v. Smith*, 105 Idaho 71 (App.1983) at 76 [665 P.2d 1081, 1086]:

" 'By the expenditure of public funds the state never intended to create any greater public right to the road than was granted by the Cordwells. It is presumed that the state received the benefits for which it contracted. Under these circumstances, we do not believe that I.C. 40–103—as construed in [*State v.*] *Nesbitt* [79 Idaho 1, 310 P.2d 787 (1957)], supra—would apply.

" 'We hold that where the public agency expending funds on a roadway expressly recognizes the private character of the road, and does not intend to create or to assert any greater rights than those allowed by the owner of the roadway, I.C. 40–103 does not operate to make the road public ...' [2]

"In late May or early June of 1939 (approximately the time of every year receding snows permitted travel on the road, Beulah Reeves (who managed the ranch for the owners, Chase A. Clark and Jean Clark, his wife) arrived at the ranch. Beulah was a half sister to Jean Clark. In later years, Beulah acquired an interest in the ranch; one third in 1945 or 1946, increased to one-half in 1950. She retained an interest until 1970. The ranch became a guest ranch in 1920 and continued to be until purchased by Sorensen in 1981. Except for a few winters, the operation was basically Memorial Day through Labor Day.

"Beulah and the then-owners, subsequent interest-holders with Beulah, and other successors-in-interest until Bruce Le-

Favour acquired the ranch in 1975, did not know of the County's abandonment of the road. Beulah's recollections upon seeing the Forest Service initially appear at the ranch with a road grader were: she never gave it a thought in a public road context; believed the Forest Service had an easement for a fireguard, for planting fish in Warm Springs Creek which flowed to and through westerly portions of the ranch, and for a forest trail. Beulah's conceptual easement commenced from the road on the ranch at a driveway leading into the swimming pool and lodge area and proceeded southerly through the ranch into the Forest Service's warm springs drainage. The easement basically would be over the intrusion, a narrow strip of federal land hereinbefore mentioned. Beulah was aware of the Forest Service keeping a tool shed alongside the driveway for its easement purposes.

"As the years passed, Beulah considered the relationship with the Forest Service as being 'nice.' Her thoughts of the road were that it was a Forest Service road for the public because the Forest Service graded it and had put in a bridge. She also thought the Forest Service maintenance of the road was desirable for the ranch because; the ranch had no road maintenance equipment, the ranch depended for its business upon drop-ins from the public users of the road, and the ranch wanted the fire protection accorded by the Forest Service.

"Use of the road following the reroute of the Challis–Stanley highway declined. There was some Forest Service related logging, spring and fall cattle movement to and from Forest Service grazing land, fishermen, hunters, campers, and ranch guests which included locals who dined at the ranch. Use by salmon fisherman sharply declined in the 1970's—salmon being effectively 'lost' by then. Logging and cattle movement ceased by the early 1970's.

"The ranch is totally surrounded by federal land. There is not one portion of the federal land that is not accessible to the

---

**2.** We cited this holding from *Cordwell* with approval in *Tomchak*, 108 Idaho at 448, 700 P.2d at 70 (1985).

954

public without the ranch road stretch. At all times since 1939, the Forest Service had easement rights pertaining to the ranch.

"From the time of the abandonment, the status of the Forest Service and the ranch owners as neighbors colored their relationship as to the road. They were neighbors geographically, and in a friendly connotation as far as ranch-visiting-employees of the Forest Service were concerned. In this, road crews would take occasion to stop at the ranch lodge for coffee. The Forest Service for many years, during the summertime, conducted at the ranch lodge a regular Sunday evening program where slides were shown depicting the grandeur of the adjacent Forest Service land. For many years, the Forest Service and the ranch had a joint dump or garbage disposal on ranch land.

"When we address the intentions of the Forest Service as to their maintenance of the ranch road stretch, we muse as from whom within the organization we draw an intention; whether it be the seasonal road equipment worker, the various forest service rangers, the local Forest Service supervisor, regional supervisors, the chief in Washington, D.C., or the Secretary of the Department of Agriculture. As with any organization, its authority and purposes are a general guide, and manifestations of intent are relevant.

"The nature of the 10.2–mile Forest Service road and its maintenance, which included the .8–mile ranch stretch, is to be examined. The ranch stretch is a traveled way 12 to 14 feet wide. The Forest Service classified the road as a Forest Development Road. It was considered a low standard road; basically a dirt road. A Forest Development Road can include private roads on private property (Query: herein of easements or consent use?), and is deemed to be under Forest Service jurisdiction to the extent the federal government has property interests in the road. The Forest Service considers the road to be necessarily open for public use, but dependent upon Forest Service permission, including the right to close. A Forest Development Road is established for all needs of the

Forest Service. Forest Service road and trail funds are to be used for Forest Service purposes only. For example, the plowing of snow could not be performed unless there was a Forest Service purpose. There being none arising as to the road in question, none was ever accomplished by the Forest Service. When the ranch owners desired to remove snow in Section 70454(1) they were required to get a permit; but were not so required as to Section 70454(2), the ranch road.

"The Forest Service never intended to acquire a right-of-way over the ranch by its maintenance.

"The use of the ranch road by the public over the years since 1939 (until the advent of the Sorensens), was with the blessing of the ranch owners, all of whom operated the ranch as a guest ranch open to the public. Only LeFavour, who acquired the ranch in 1975, attempted to control users who camped or hunted on the ranch, or operated a vehicle, motorbike, or snowmobile in a disruptive manner. In July, 1981, Sorensens excluded the public from the ranch.

■ "Ranch owners up to LeFavour thought the public had a right to use the road because it was a Forest Service road, because the Forest Service maintained it, or because it had historically been a public road. Some long-time public users thought it was a public road because they had known it to be a public road because it was a Forest Service road. The intent of the general public in their use is not of importance in determining if the ranch road was public.

■ "The court is of the opinion the Forest Service had and has some private easement rights over the ranch road. In this, the federal government was an abutting owner upon the abandoned .8–mile stretch of road by virtue of the patent description which left the intrusion of federal government land connecting with the road. Such an abutting owner has private easement rights which survive an abandonment of a public road. *Lower Payette Ditch Co. v. Smith,* 73 Idaho 514 [254 P.2d 417] (1953); ANNO: *Private Easement in Vacated Highway,* 150 A.L.R. 644. The Forest Ser-

vice had a right of ingress and egress from either end of the ranch road stretch. Aside being an abutting owner by virtue of the intrusion the federal government was an abutting owner on the abandoned segment on both sides of the ranch.

"Sorensens contend the intrusion does not abut the road. The only reasonable rationale for the intrusion is as an intended access to the historic road. The court finds the description of the intrusion made a connection with the southerly edge of the road right-of-way as it existed at the time the patent issued.

"Because abandonment of the entire segment by Custer County actually occurred, the Forest Service considered the entire segment of the old highway as abandoned by the County. It considered the upstream stretch from Mulley Creek to the ranch and downstream from the ranch to Slate Creek as being within its jurisdiction.

"The ranch owners were abutting owners also. Actually, no concern for reaching their ranch resulted from the declared abandonment: first, the declared abandonment left as public the easiest access portion of the old highway segment, i.e., from Mulley Creek into the ranch to Warm Springs Creek; second, because the Forest Service undertook some maintenance on all of the old highway segment.

"In 1971, ranch owners and the Forest Service began discussing an exchange of land or easements to enable the Forest Service to acquire an easement deed on the ranch road section. Underlying this appeared to be restrictions on Forest Service finances in maintaining the ranch road, absent such an easement. Further, the Forest Service considered it had no right to take materials from alongside the road to improve the road surface or its drainage. Ex. 34. In 1972, the owners proposed to give such road right-of-way in exchange for the intrusion, plus a pasture and hot spring area near the ranch owned by the federal government. Restrictions on exchanges by the Forest Service frustrated negotiations. Exs. 35, 36 and 37.

"Bruce LeFavour came on the scene as owner of the ranch in 1975. LeFavour attempted to trade a right-of-way on the ranch road for other land, and again, the Forest Service restrictions prevented further action. LeFavour informed the Forest Service he thought the ranch road was private, that he consented to Forest Service use and maintenance, and that public use would be permitted. LeFavour constructed gates at both ends of the ranch in August 1976. He did not lock the gates during the snow-free months.

"In 1976, LeFavour's gates generated impetus in some road users and the Forest Service to convince Custer County it should declare the ranch road to be public. Exs. 30 and 40.

"In 1980, the plan of the Sawtooth National Recreation Area to acquire a right-of-way on the ranch road in connection with acquiring a scenic easement in the ranch was still some two years away. Ex. 51. Exclusion of the public from the ranch road in July 1981 was a final motivation for Forest Service and Custer County to enter into a 'Forest Development Road Agreement.' Ex. 15. The agreement was entered with an understanding the County was not committed to maintenance obligations. Exs. 49 and 51. A purpose of the agreement was to obtain a public right-of-way for a road across the ranch by having the County declare the road a county road. The County did make a declaration that the road was a public road. Ex. 16.

"The Forest Development Road Agreement contemplates 'A strip of land 50 feet in width (25 feet on each side of the existing road centerline) ..'; the County's complaint seeks such 50 foot wide easement. How can a road that has been six to seven feet wide from its centerline for decades become a relative behemoth; a 50 foot wide highway? In *Meservey v. Gulliford*, 14 Idaho 133 [93 P. 780] (1908) the court upheld a 50 foot width granted by the trial court under I.C. 40–202 (then R.S. 851). A distinguishing fact present in that case was that there was evidence in *Meservey* that the road was on a section line, and was twenty five feet wide on each side of the section. This court is of the opinion *Meservey* is so distinguishable from the case at

bar. In this case the 'actual possession' or 'usual width in the neighborhood' doctrines would apply. See, *Meservey,* supra, at 148 [93 P. 795]. I.C. 40–701 provides:

"'All highways, except alleys and bridges and streets located within town-sites, must be not less than fifty feet (50') wide, *except those now existing of a lesser width,* and may be as wide as required for proper construction and/or maintenance in the discretion of the public authority in charge of such construction and/or maintenance.' (Emphasis added).

"Applicable to a I.C. 40–202 road is the exception in I.C. 40–701, '. . . except those now existing of a lesser width, . . .' A 20–foot wide right-of-way would be more appropriate for such a forest area road.

"The record discloses that the Forest Service maintenance of the Robinson Bar Road was just to suit the purposes of the Forest Service. Before abandonment, the use of the road by the Forest Service was as a member of the public, as was the use by the ranch. After abandonment, use of the sections on federal land were circumscribed by what the Forest Service permitted. While no restrictions on travel were imposed by the Forest Service, there were resultant restrictions based on what road conditions were maintained by the Forest Service, and what others were permitted to do by way of road maintenance. The Forest Service had no interest in maintaining the road each year until late springtime or early summer—this suited the Forest Service needs. If the ranch people desired earlier maintenance to reach the ranch, a permit to do work was required. Ranch people could do what they wished on the ranch road.

"From 1970, at least, the intrusion on part of which the 'front yard' of the ranch has existed, has been used by the ranch owners under a special use permit from the Forest Service. During the 1960's the Forest Service created a trail into the upper Warm Springs drainage along the west side of the creek, commencing at the road within the ranch and proceeding southerly within the ranch. The intent of the Forest Service was to relieve the ranch owners of the burden of having the upper Warm Springs traffickers use the intrusion through the ranch's 'front yard.'"

"From time to time over the years since 1939 to 1976 there have been either gates or cattle guards at the east-west road entrances to the ranch. The gates rarely were locked. During the World War II years (1943–4) there were occasions when gates were locked. It is inferred wartime restrictions sorely limited travelers and the guest ranch operation. From 1950, cattle guards were the main control of horses and cattle, including those owned by the ranch and the strays of others. Basically, there was never any intent to exclude persons from using the road across the ranch by means of gates.

"In August 1976, Bruce LeFavour installed gates on the road at each entrance to the ranch. His purposes included: (1) livestock control; (2) as an aid in deterring or excluding through-the-ranch motorcyclists and snowmobilers, and hunters who might intend to hunt on the ranch.

"The upstream gate was kept open except when the ranch's guest business was not open. The gates were not locked.

"In conjunction with the installed gates, LeFavour posted notices at the gates to the effect the property being entered was private property. The notices to that effect, as renewed from time to time, did not specify the road as being private; except in the Spring of 1981, a posted notice on the upstream gate did so specify.

"What is the meaning of all this, relevant to the ultimate factual questions of the road having been used as a highway, and worked and kept up at public expense within the meaning of I.C. 40–202?

"The public use of the sections of road on federal land was use of a Forest Service road, and use of the section across the ranch was of a private road with consent of the owners.

"As is disclosed, the use by the public of a Forest Service road is at the will of the Forest Service. This does not equate to a county road. The public funds expended

by the Forest Service on the ranch road were expended for its purposes, from which the travelling public could benefit when permitted by the Forest Service and the ranch owner.

"Counsel for Sorensen illuminates this concept by arguing that if this is a county road, then all 5-year-old Forest Service roads used by the public are county roads; that the county wherein any such road is situate can be required to exercise general supervision over it and see to its maintenance. I.C. 40-604.

"It is argued that *State v. Nesbitt*, 79 Idaho 1, [310 P.2d 787], is compelling for the proposition that Forest Service maintenance equates to a road being maintained 'at the expense of the public' within the meaning of I.C. 40-202.[3]

"An analysis of *Nesbitt* discloses a holding that the road in question was a public road before issuance of a patent, and had never been abandoned; further, that the road had also been maintained by the county and state.

"The road in *Nesbitt* was not a road under control of the Forest Service as in the case at bar. There was no need for the majority to address, as did Justice Smith in dissent, I.C. 40-109(b). The genesis of I.C. 40-109(b) was Session Laws 1951, ch. 93, sec. 4, p. 165. The chapter extensively created a highway and road system for state, county, municipal and road districts. Then I.C. 40-109(b) stated:

" 'A "county road system" shall comprise all public highways in a county *except* those included within the state highway system, those included within municipal street systems of incorporated cities and villages, and *those under federal control.*' (Emphasis added)

The present statute is substantially the same, I.C. 40-104(6).

"The court is of the opinion the foregoing statutes disclose that counties have no duties relative to Forest Service roads, nor rights to declare them county roads under I.C. 40-202.

"Contentions the entire segment is a public road under Federal Law pursuant to 43 U.S.C. 932 are without merit.[4]

---

**3.** We find it doubtful that Forest Service maintenance of a road can satisfy the requirements of I.C. § 40-202. In addition to I.C. § 40-104(6) cited by Judge Beebe, which *excludes* roads under federal control from a county's road system, we note that I.C. § 40-117(4) defines "public highways" as "all highways open to public use in the state, whether maintained by the state or by any county highway district, city, or other political subdivision." There is no mention of maintenance by the Forest Service or any other federal agency. "Political subdivision" obviously refers to political subdivisions of the state.

Language to the contrary in *Nesbitt*, 79 Idaho 1, 7, 310 P.2d 787, 793, relied upon by the Frenches and Schoonens is simply not accurate. The *Nesbitt* court, over the vigorous dissent of Justice Smith, rejected a jury instruction which read as follows: "You are instructed that by the term 'public expense' is meant at the expense of the county." The majority concluded that "[a] road could be worked and kept up at public expense by a highway district, road district, the county, the state highway department, *the United States,* or other taxing unit organized, among other things to build and maintain public highways." 79 Idaho 1, 7, 310 P.2d 787, 793 (emphasis added). This language flies in the face of I.C. § 40-117(4), then extant as I.C. § 40-2604(e) (1977) and cannot stand.

In dissent, Justice Smith argued against the proposition advanced by the *Nesbitt* majority

now urged upon us by the Frenches and Schoonens: "[N]o agency, such as the Forest Service by performance of work on a private road could thereby impose upon the county the burden of thereafter maintaining that road, which would be a county burden at public expense, if a county road." 79 Idaho at 12-13, 310 P.2d at 799-800.

**4.** Judge Beebe's brief statement on this issue merits additional comment. The federal statute, 43 U.S.C. 932, constitutes an offer by the federal government to dedicate unreserved lands for highway purposes, which offer must be accepted by the public in order to be effective. *State v. Crawford*, 7 Ariz.App. 551, 441 P.2d 586, 590 (1968). Acceptance must be either by,

> user by the public for such a period of time, and under such conditions as to establish a highway under the laws of this state; or there must be some positive act or acts on the part of the proper public authorities clearly manifesting an intention to accept such grant with respect to the particular highway in question.

*Kirk v. Schultz*, 63 Idaho 278, 282-3, 119 P.2d 266, 268 (1941); *accord, Roper v. Elkhorn at Sun Valley*, 100 Idaho 790, 605 P.2d 968 .(1980).

Neither the Frenches nor the Schoonens point to any positive act by Custer County clearly manifesting an intent to accept the federal offer

"Based on the foregoing, it is the court's holding that the expenditures of Forest Service money is not 'at the expense of the public' within I.C. 40–202; that the money was expended to maintain a private easement or license across the ranch's private road. The road was travelled by the public with the consent of the owners. The Forest Service rights, whatever they may be, are private and do not qualify the road as a 'public' or 'county' road." R., pp. 684–695.

■ The above opinion of Judge Beebe disposes of the claims that the Robinson Bar Ranch segment of the road is a public road pursuant to I.C. § 40–202 or pursuant to 43 U.S.C. 932. Below we adopt the succinct and accurate manner in which he handled, upon a motion for summary judgment by the Sorensens, the claims of private prescriptive easement, estoppel and quasi-estoppel:

> Count Two is a rather straightforward claim of a private prescriptive right of way across defendants' property. However, here Plaintiffs' use of the road upon the defendants' ranch was based upon their conception that the road was a public road. If they thought it a public road, their use could not be proprietary in nature. *Hall v Strawn*, 108 Idaho 111 [697 P.2d 451] (Idaho App.1985); *Cusic v. Givens*, 70 Idaho 229 [215 P.2d 297] (1950); *Simmons v. Perkins*, 63 Idaho 136 [118 P.2d 740] (1941).

> Counts Three and Four assert the doctrines of quasi-estoppel and estoppel. The record dispels various of the necessary elements of the doctrines. See: *Tommerup v Albertson's Inc.*, 101 Idaho 1 [607 P.2d 1055] (1980). There is no material issue of the fact that neither the Sorensens nor their predecessors in interest ever discussed the private or public nature of the road with plaintiffs, so could not have made a false representation thereto. There is no evidence of concealment of a material fact; any advantage gained; or disadvantage induced. *Swanson v. State*, 83 Idaho 126,

358 P.2d 387 (1961). Silence generally cannot be relied on to support estoppel in cases such as this. *Joplin v. Kitchens*, 87 Idaho 530, 394 P.2d 313 (1964). R., pp. 1190–91.

■ The Sorensens seek attorneys fees incurred in the defense of the prescriptive easement and estoppel claims. Judge Beebe found that extensive factual contentions were presented which were argued under fairly debatable legal principles. He ruled that "[s]imply being a prevailing party is not sufficient for an award of attorney [fees] under the statute and Rule [I.C. § 12–121, I.R.C.P. 54(e)(1)]." R., p. 1274. We agree and affirm his denial of fees and also deny attorneys fees on appeal.

Our holding today is a narrow one. Because the 1919 federal patent did not except the road, other than an easement in the Forest Service, Chase A. Clark and his successors down to the Sorensens held title to the roadway in fee. When the county unequivocally abandoned the road in 1939, the owners had a perfect right to bar access. Public use was with the consent of the owners, but gates could be installed and locked without subjecting those locking them to the penalties contained in I.C. § 40–207 (1985) (fine of not more than $500 and imprisonment not to exceed 90 days).

■ However, since 1963 the statute governing abandonment and vacation of county roads, I.C. § 40–203, has provided that roads that furnish public access to state or federal public lands or waters cannot be obstructed without first petitioning the county commissioners or highway district. The commissioners having jurisdiction must then take some affirmative action before abandonment is complete. *Blaine County v. Bryson*, 109 Idaho 123, 705 P.2d 1078, 1080 (Ct.App.1985). Significantly, Judge Beebe here specifically found that "[t]he ranch is totally surrounded by federal land. There is not one portion of the federal land that is not accessible to the

---

such as a resolution passed by the county commissioners. *See Roper v. Elkhorn*, supra, 100 Idaho at 794, 605 P.2d at 972. Even if the county had accepted, it abandoned the road in

1939. Since we agree with Judge Beebe that no county highway was established by public use and maintenance under Idaho law, neither condition for acceptance of the federal offer is met.

public without the ranch road stretch."
*Supra*, pp. 953–954, 751 P.2d pp. 101–102

As a result, private landowners, by obstructing public access to public lands or waters, act at their peril unless the detailed requirements of our statutes are satisfied strictly.

The judgments of the district court are affirmed. Costs on appeal, exclusive of attorney fees, to respondents.

SHEPARD, C.J., and BAKES and HUNTLEY, JJ., concur.

DONALDSON, J., sat, but did not participate due to his untimely death.