

DA 10-0436

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 263

YELLOWSTONE RIVER, LLC, a Montana
limited liability corporation,

        Plaintiff and Appellant,

  v.

MERIWETHER LAND FUND I, LLC, a
Delaware limited liability company,
and MERIWETHER LAND CO., LLC, a
foreign limited liability company,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Sixth Judicial District,
                    In and For the County of Sweet Grass, Cause No. DV-07-15
                    Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                J. Robert Planalp, Landoe, Brown, Planalp & Reida, PC,
                Bozeman, Montana

                Robert L. Jovick, Attorney at Law, Livingston, Montana

        For Appellees:

                David M. Wagner, Crowley Fleck, PLLP, Bozeman, Montana

                Submitted on Briefs:  April 6, 2011

                            Decided:  October 25, 2011

Filed:

                      _____
                              Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Yellowstone River, LLC (hereinafter "YR") commenced this action against Meriwether Land Fund I, LLC, and Meriwether Land Co., LLC (collectively "Meriwether") in the Sixth Judicial District Court, Sweet Grass County. YR sought a determination that it has an easement to access its property over Meriwether's adjacent property. YR raised multiple theories in support of its alleged easement; however, through summary judgment proceedings, the issue was narrowed to the sole question whether YR has an easement by necessity. Ultimately, the District Court ruled that an easement by necessity does not exist over Meriwether's property for the benefit of YR's property. YR now appeals.

¶2 The sole issue on appeal is whether the District Court erred in granting summary judgment to Meriwether on YR's claim of easement by necessity. We agree with YR that the District Court erred in part of its analysis. We conclude, however, that the District Court nevertheless reached the correct result, and we accordingly affirm.

### BACKGROUND

### The Properties and the Alleged Easement

¶3 The properties at issue are located east of Big Timber, Montana, in Township 1 North, Range 15 East, Montana Principal Meridian. YR owns essentially the western half of Section 22. YR's property is bounded on the west by the Yellowstone River and on the north, east, and south by property owned by Meriwether. Specifically, Meriwether owns Section 15, the east side of Section 22, and the portion of Section 27 north and east of the Yellowstone River. Meriwether's holdings also include Sections 13, 14, and 23,

2

and portions of Sections 10, 11, and 26. Howie Road is a public road that runs east-west along the north lines of Sections 10, 11, and 12. Spannering Road runs south from Howie Road along the boundary between Sections 10 and 11. Spannering Road is a public road for the first half mile south from Howie Road. The layout of these properties and roads is shown below on Diagram I.[1] Meriwether's property is the area enclosed by the semibold line. YR's property is represented by the crosshatching in Section 22.

## DIAGRAM I



---

[1] Diagram I and Diagrams II, V, and VI (below) are included in the record, with some labeling added and editorial modification for clarity.

¶4      Sections 26 and 27 contain steep, cliff-like terrain.  Thus, YR claims an easement

from the north.  As noted, Spannering Road is a public road from Howie Road south to

the quarter corner of Sections 10 and 11.  The dirt-and-gravel road then continues in a

southerly direction, generally following the boundary lines between Sections 10 and 11

and Sections 14 and 15.  The road turns southwesterly into Section 15's southeast quarter

and then, upon reaching some old ranch buildings, veers southeasterly and continues into

Section 23.  YR contends that its easement, shown below on Diagram II, follows this

road to the old ranch buildings and then proceeds southwesterly to a point where it

crosses the north boundary of YR's Section 22 property.

**DIAGRAM II**



**Land Grants to the Railroads**

¶5      The basis of YR's easement claim requires an understanding of the land grants by Congress to railroad companies in the nineteenth century. The Supreme Court discussed the history of these grants in detail in *Leo Sheep Co. v. U.S.*, 440 U.S. 668, 99 S. Ct. 1403 (1979). In summary, the federal government desired in the mid-1800s to settle the American West, a desire that was intensified by the need to provide a logistical link with California in the heat of the Civil War. To that end, there was a push to construct a transcontinental railroad. The venture was too risky and too expensive for private capital alone, however, and private investors would not move without tangible governmental inducement. Yet, there was serious disagreement as to the forms that inducement could take. One extant school of thought argued that "internal improvements," such as railroads, were not within the enumerated constitutional powers of Congress and that the direct subsidy of a transcontinental railroad was constitutionally suspect. The response to this constitutional "gray" area, and source of political controversy, was the "checkerboard" land-grant scheme. *Leo Sheep*, 440 U.S. at 670-72, 99 S. Ct. at 1405-06.

¶6      At this point, a short diversion is necessary. Pursuant to acts of Congress passed in the late 1700s and early 1800s, the public lands of the United States north of the Ohio River and west of the Mississippi River (except Texas) were surveyed into rectangular tracts called "townships." Joyce Palomar, *Patton and Palomar on Land Titles* vol. 1, § 116, 291, 294 (3d ed., West 2003); *see also* Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* 125-66 (6th ed., John Wiley & Sons 2009) (discussing the development of the Public Land Survey System); Curtis M. Brown,

Walter G. Robillard, & Donald A. Wilson, *Evidence and Procedures for Boundary Location* 179-200 (2d ed., John Wiley & Sons 1981) (same). With some exceptions not applicable here, each township is six miles square. A particular township's location is identified relative to an east-west base line and a north-south principal meridian. *See* Palomar, *Patton and Palomar on Land Titles* at 294-95. In some states, there is more than one base line or principal meridian. In Montana, however, there is just one of each, as shown below on Diagram III.[2] The Montana Principal Meridian was adopted in 1867. It and Montana's base line intersect in Gallatin County, near Willow Creek, Montana.

**DIAGRAM III**



As noted, YR's and Meriwether's properties are located in Township 1 North, Range 15 East, Montana Principal Meridian—meaning they are in the first east-west strip of townships lying north of the base line, and in the fifteenth north-south strip of townships lying east of the Montana Principal Meridian (each "strip" being six miles wide).

___

[2] Diagram III was obtained from the U.S. Bureau of Land Management website: http://www.blm.gov/wo/st/en/prog/more/cadastralsurvey/meridians.html.

¶7 Townships are subdivided into 36 tracts called "sections." In theory, each section is one mile square and contains 640 acres.[3] The sections are numbered consecutively, commencing with section 1 at the northeast corner and proceeding west to section 6; thence in the next tier proceeding east from section 7 to section 12; and so on, back and forth, until section 36 is reached in the southeast corner. Palomar, *Patton and Palomar on Land Titles* at 296. A subdivided and numbered township is shown in Diagram IV.[4]

**DIAGRAM IV**

| | | | | | | |
|---|---|---|---|---|---|---|
| 6 | 5 | 4 | 3 | 2 | 1 | |
| 7 | 8 | 9 | 10 | 11 | 12 | 6 miles (480 chains) |
| 18 | 17 | 16 | 15 | 14 | 13 | |
| 19 | 20 | 21 | 22 | 23 | 24 | |
| 30 | 29 | 28 | 27 | 26 | 25 | |
| 31 | 32 | 33 | 34 | 35 | 36 | |

Township of 36 sections

1 mile (80 chains)

[3] Due to the earth's curvature, meridians converge as they approach the north. Thus, it is inherently impossible to lay out a square section with its lateral boundaries oriented to true north. Due to this fact, and due to the limitations of the surveying equipment used at the time, sections are not always exactly one mile square. *See* Walter G. Robillard & Lane J. Bouman, *Clark on Surveying and Boundaries* § 5:15, 139-40 (7th ed., Lexis Law 1997); Palomar, *Patton and Palomar on Land Titles* at 298; *Maricopa Co. v. Pima Co.*, 267 P. 601, 602 (Ariz. 1928); *John Taft Corp. v. Advisory Agency*, 207 Cal. Rptr. 840, 843 (Cal. App. 2d Dist. 1984); *Colvin v. Fell*, 40 Ill. 418, 422 (1866); *Larsen v. Richardson*, 2011 MT 195, ¶ 37 nn. 9, 11, 361 Mont. 344, 260 P.3d 103.

[4] Diagram IV was obtained from *Dykes v. Arnold*, 129 P.3d 257, 262 (Or. App. 2006).

Of significance to the present discussion, it should be noted that even-numbered sections are bounded on four sides by odd-numbered sections, and vice versa. For example, section 22 is bounded by sections 15, 21, 23, and 27. This resulted in the "checkerboard" land-grant scheme referred to above and described below.

¶8 The backdrop of the *Leo Sheep* case was the Act of July 1, 1862, 12 Stat. 489, which granted public lands to the Union Pacific Railroad for each mile of track that it laid. Land surrounding the railway right-of-way was divided into "checkerboard" blocks. Odd-numbered sections were granted to Union Pacific, and even-numbered sections were reserved by the federal government, thus resulting in a checkerboard of public and private lots. Hence, Union Pacific land in the area of the right-of-way was usually surrounded by public land, and vice versa. The price of the government's reserved sections was doubled so that it could be argued, in order to disarm the "internal improvement" opponents, that by giving half the land away and thereby making possible construction of the railroad, the government would recover from the reserved sections as much as it would have received from the whole. *Leo Sheep*, 440 U.S. at 672-73, 99 S. Ct. at 1406.

¶9 The land grants made by the Union Pacific Act included the odd-numbered sections within 10 miles on either side of the track. But when Union Pacific's original subscription drive for private investment proved a failure, the land grant was doubled by extending the checkerboard grants to 20 miles on either side of the track. *See* 13 Stat. 356, 358 (1864). The Union Pacific Act specified a route west from the 100th meridian (in central Nebraska) to California. Construction commenced in July 1865, and thus began a race with the Central Pacific Railroad, which was laying track eastward from

Sacramento, for the federal land grants which went with each mile of track laid. The race culminated in the driving of the golden spike at Promontory, Utah, on May 10, 1869. *Leo Sheep*, 440 U.S. at 676-77, 99 S. Ct. at 1408-09. Notably, the policy of subsidizing railroad construction by lavish grants from the public domain incurred great public disfavor, *Great N. Ry. Co. v. U.S.*, 315 U.S. 262, 273, 62 S. Ct. 529, 533 (1942), and in 1872, the House of Representatives enacted a resolution condemning the policy, *Leo Sheep*, 440 U.S. at 677 n. 13, 99 S. Ct. at 1408 n. 13.

¶10 The backdrop of the present case is the Act of July 2, 1864, 13 Stat. 365, which created the Northern Pacific Railroad Company.[5] The Northern Pacific Act granted the company the right-of-way through the public lands for the construction of a railroad and telegraph line, contemplated to be about 2,000 miles in length, from Lake Superior to Puget Sound. The Act also granted the company non-mineral public lands to subsidize the construction. Like the Union Pacific Act, the Northern Pacific Act involved a checkerboard land-grant scheme: Northern Pacific received odd-numbered sections; the federal government reserved even-numbered sections. The grant applied to land within 20 miles on either side of the track as it passed through any state, and 40 miles on either side of the track as it passed through any territory. Several other details of the legislation, explained below, are relevant to the parties' arguments in the present case.

¶11 When the 1864 grant was made, substantially the entire country between Lake Superior and Puget Sound was untraveled and uninhabited except by Indians, very few of

---

[5] The Northern Pacific Railroad Company and its property were acquired by the Northern Pacific Railway Company in 1896. *See N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 33 S. Ct. 554 (1913).

whom, at that time, were friendly to the United States. *Nelson v. N. Pac. Ry. Co.*, 188 U.S. 108, 113, 23 S. Ct. 302, 303 (1903). The principal object of the grant was to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores by means of a railroad and telegraph. 13 Stat. at 367. To that end, it was deemed important to encourage settlement of the country along the proposed route. However, the public lands in that vast region were unsurveyed, and it was not known when they would be surveyed. Congress, of course, knew that if individuals accepted the government's invitation to establish homes upon the unsurveyed public lands, they would do so in the belief that the lands would be surveyed, their occupancy would be respected, and they would be given an opportunity to perfect their titles in accordance with the homestead laws. *Nelson*, 188 U.S. at 113, 23 S. Ct. at 303. Not surprisingly, it was sometimes the case that homestead occupations occurred on land that turned out, after the government survey was completed, to be in odd-numbered sections which otherwise would have belonged to Northern Pacific—the *Nelson* case being an example. *Cf. N. Pac. Ry. Co. v. Smith*, 62 Mont. 108, 203 P. 503 (1921) (involving a claim to an odd-numbered section based on adverse possession).

¶12 Formerly, public lands that would probably be affected by a grant to a railroad company were, as soon as the grant was made, if not in advance of it, withdrawn from the market. But experience proved that this practice retarded the settlement of the country. Thus, by the 1860s, the rule was not to withdraw the lands until the railroad line was actually located. In this way, the ordinary working of the land system was not disturbed. Private entries, preemption, homestead settlements, and reservations for special uses

continued within the supposed limits of the grant, the same as if the grant had not been made. But they ceased when the railroad route was definitely fixed. If it then appeared that a part of the lands within the limits of the grant had been sold at private entry, taken up by preemptors, or reserved by the United States, an equivalent was provided. *Leavenworth, Lawrence, & Galveston R.R. Co. v. U.S.*, 92 U.S. 733, 748 (1876).

¶13    For example, the grant to Northern Pacific included only those odd-numbered sections (within the 20-mile or 40-mile limits) to which the United States had full title, and which had not been previously reserved, sold, granted, or otherwise appropriated, and which were free from preemption or other claims or rights, *at the time the railroad line was definitely fixed*. 13 Stat. at 367-68; *Nelson*, 188 U.S. at 116, 23 S. Ct. at 304; *see also e.g. N. Pac. R.R. Co. v. Sanders*, 166 U.S. 620, 629-36, 17 S. Ct. 671, 674-77 (1897). In lieu of any odd-numbered sections (or parts thereof) that had been granted, sold, reserved, occupied by homestead settlers, preempted, or otherwise disposed of prior to the date of definite location of the railroad line, the company was entitled to select lands consisting of odd-numbered sections not more than 10 miles beyond the original 20-mile or 40-mile limits.[6]  13 Stat. at 368.

¶14    The Northern Pacific Act called for a railroad and telegraph line "by the Northern Route." The Act did not specify the precise course; it merely stated that the line was to begin at a point on Lake Superior and proceed "westerly by the most eligible railroad

_____

[6] The two 10-mile strips were known as the "indemnity belts" or "indemnity limits." *See U.S. v. N. Pac. Ry. Co.*, 256 U.S. 51, 64, 41 S. Ct. 439, 442 (1921). Losses within the original limits of the Northern Pacific grant, due to appropriations prior to the definite location, and due to the exclusion of mineral lands, ultimately amounted to several million acres. *U.S. v. N. Pac. Ry. Co.*, 256 U.S. at 60, 41 S. Ct. at 440.

route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude to some point on Puget's Sound." 13 Stat. at 366. At the same time, however, the Act stated that "there be, and hereby is, granted" to Northern Pacific the odd-numbered sections which are within the specified distances "on each side of said railroad line, as said company may adopt," and which had not been previously appropriated "at the time the line of said road is definitely fixed." 13 Stat. at 367. Because these words imply that the property itself is passed, not any special or limited interest in it, and that there is a transfer of a present title, not a promise to transfer one in the future, the Supreme Court interpreted the grant as one "*in praesenti*; that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, preemption or other disposition previous to the time the definite route of the road is fixed." *St. Paul & Pac. R.R. Co. v. N. Pac. R.R. Co.*, 139 U.S. 1, 5, 11 S. Ct. 389, 390 (1891). The precise route not being known in 1864, "the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification." *St. Paul & Pac.*, 139 U.S. at 5, 11 S. Ct. at 390; *see also Sanders*, 166 U.S. at 634, 17 S. Ct. at 676 (the company acquired "an inchoate right" to the odd-numbered sections; no right attached to any specific section until the road was definitely located, and the map thereof filed and accepted); *Smith*, 62 Mont. at 114-17, 203 P. at 504-05 (in addition to fixing the definite location of the road, it was necessary that the government survey be completed and approved; the title to particular sections did not pass until they had been surveyed and identified). But once the odd-numbered sections were identified, "the title attached to

12

them as of the date of the grant," except as to those that had been appropriated to other purposes in the interim. *St. Paul & Pac.*, 139 U.S. at 5, 11 S. Ct. at 390; *Deseret Salt Co. v. Tarpey*, 142 U.S. 241, 248, 12 S. Ct. 158, 161 (1891); *see also Hewitt v. Schultz*, 180 U.S. 139, 151, 21 S. Ct. 309, 313 (1901) (the title "relates back" to the 1864 act).

¶15     Whenever 25 consecutive miles of any portion of the railroad line became ready for service, the President was to appoint three commissioners to examine the same. If it appeared that the line had been completed in a good, substantial, and workmanlike manner, patents were to be issued to Northern Pacific for the lands situated opposite to, and coterminous with, the completed portion. This procedure was to be repeated as each stretch of 25 miles was completed. 13 Stat. at 368. The patents were "not essential to transfer the legal right" to Northern Pacific, however. *Deseret Salt Co.*, 142 U.S. at 251, 12 S. Ct. at 162. Rather, the patents served as evidence that, as to that portion of the railroad line, the conditions of the grant had been complied with. They also obviated the need for any further evidence of the company's title. *St. Paul & Pac.*, 139 U.S. at 6, 11 S. Ct. at 390. As noted, title to Northern Pacific's odd-numbered sections (those that it ultimately received under the Act) related back to the date of the grant. In this regard, the Supreme Court explained: "There are many instances in the legislation of congress where patents are authorized to be issued to parties *in further assurance of their title*, notwithstanding a previous legislative grant to them, or a legislative confirmation of a previously existing claim. The previous grant or confirmation is in no respect impaired thereby, or its construction affected." *St. Paul & Pac.*, 139 U.S. at 6, 11 S. Ct. at 390 (emphasis added); *see also N. Pac. R.R. Co. v. Majors*, 5 Mont. 111, 2 P. 322 (1884).

¶16 The upshot of this scheme is that the issuance of the patent did not mark the point in time when title to the land vested in Northern Pacific. Title vested as of the date of the 1864 grant. But the identity of the odd-numbered sections to which the title attached was not determined until the railroad line was definitely located and the government survey completed. "Obviously, until surveyed, no odd-numbered sections could exist." *U.S. v. N. Pac. Ry. Co.*, 311 U.S. 317, 344, 61 S. Ct. 264, 277 (1940); *see also U.S. v. Mont. Lumber & Mfg. Co.*, 196 U.S. 573, 577, 25 S. Ct. 367, 368 (1905) (the survey of the land—i.e., the identification of the sections, whether odd or even—was reserved to the government).

¶17 Moreover, at that point, the company's title attached to only those odd-numbered sections which had not been granted, sold, reserved, occupied by homestead settlers, preempted, or otherwise disposed of during the intervening years. In the interim, Congress could dispose of the public lands along the general route of the railroad as it saw proper, provision having been made for the indemnification of the company if an odd-numbered section to which it would have been entitled was no longer available. *Sanders*, 166 U.S. at 634-35, 17 S. Ct. at 676. In consequence, the 1864 grant did not cause each section in the checkerboard land grant to be automatically landlocked (i.e., cut off from a public road). Whether a particular section was actually landlocked could not be known until ownership of each lot within the geographic limits of the Northern Pacific grant was determined—which, again, could not be known until the government survey was completed, the railroad line definitely located, and the odd-numbered sections available to the railroad identified.

**History of Property Ownership**

¶18 In 1872, Northern Pacific filed in the General Land Office a map of the general route of its railroad through Montana. Construction westward from Minnesota reached the Yellowstone River in Montana in 1880. Meanwhile, the company began building eastward from Washington Territory in 1879. The definite location of the railroad line through the area of the parties' properties was fixed in 1881. Eastward and westward extensions met at a point in Montana (at Gold Creek, northwest of Garrison) in 1883. *See Sanders*, 166 U.S. at 623, 17 S. Ct. at 672; *U.S. v. N. Pac. Ry. Co.*, 311 U.S. at 327, 61 S. Ct. at 269; *Dellone v. N. Pac. R.R. Co.*, 16 Pub. Lands Dec. 229 (U.S. Dept. Int. 1893).

¶19 In 1877, the Surveyor General approved the survey of that portion of Township 1 North, Range 15 East, lying north and east of the Yellowstone River (where the parties' properties are situated). Thereafter, when the railroad line was definitely located, this township came within the 1864 checkerboard grant. Northern Pacific's title attached to the odd-numbered sections which had not already been appropriated to other purposes. Of relevance here, Northern Pacific's title attached to Sections 11, 15, and 23, and the northeastern portion of Section 27. A patent was issued to Northern Pacific for these and other sections in 1896.[7] The United States, on the other hand, retained ownership of Section 22, which did not have a public road running through or adjacent to it. Thus, one would have to cross Northern Pacific's land in order to reach Section 22.

---

[7] YR and Meriwether both state in their briefs that the patent was issued in 1897. This is incorrect. Patent No. 22 (identified in the record as Meriwether's Exhibit 8), which includes Township 1 North, Range 15 East, is dated July 24, 1896, on its last page. The 1897 date underneath (on the same page) is the date the document was "filed for record" by the Sweet Grass County Clerk and Recorder.

15

¶20    In 1906, Northern Pacific conveyed Sections 11, 15, and 23 to John P. Halverson. In 1908, Northern Pacific conveyed its interest in Section 27 to Waborn A. Harrison. Through subsequent transfers, these lands passed to Meriwether in 2006.

¶21    Meanwhile, Raymond L. Becker commenced a homestead entry[8] on the west side of Section 22 in 1915. Raymond, his wife, and their two children maintained continuous residence on the property and cultivated flax, wheat, and winter wheat. On June 10, 1919, the United States issued Raymond a patent for 326.86 acres. During this same period, Raymond's brother, Eugene C. Becker, filed a homestead claim on the eastern 240 acres of Section 22. Eugene established residence on that land in 1912 and was issued his patent on July 24, 1919. Raymond's and Eugene's properties are shown here on Diagram V.

**DIAGRAM V**



¶22    Raymond fell victim to influenza and died in 1919. His real property was distributed in equal shares to his wife (Marjorie) and their two children. Marjorie soon

---

[8] Act of May 20, 1862, 12 Stat. 392, and the acts supplemental thereto.

relocated to Nebraska in order to be closer to family support, and it appears that no one has lived on the Section 22 property since. In his deposition in the instant case, however, Marjorie's son-in-law recalled that Marjorie and other family members made summer visits to the property over the years and that the property was leased at various times for grazing purposes. Ultimately, the 326.86 acres were acquired by YR. (YR is comprised of two members, one of whom is Raymond's grandson.) Eugene's 240 acres, on the other hand, are now owned by Meriwether.

¶23 At no point after Northern Pacific's title attached to the odd-numbered sections has the west side of Section 22 been held in common ownership with Sections 15, 23, or 27. It is apparent, then, that Raymond had to cross property owned by other parties in order to reach his Section 22 property. As a result, YR initially alleged an easement by prescription. However, YR was not able to show continuous and uninterrupted use of this route for the requisite statutory period,[9] and YR has not appealed the District Court's order granting summary judgment to Meriwether on YR's prescriptive easement claim. Also, YR did not oppose Meriwether's motion for summary judgment on YR's private condemnation claim under Title 70, chapter 30, MCA, and YR has not appealed the District Court's order granting that motion. The only theory now pursued by YR is an easement by necessity. The District Court granted Meriwether's motion for summary judgment, and denied YR's cross-motion for summary judgment, on this claim. The court's reasoning is discussed below, where relevant.

---

[9] The statutory period was five years prior to 1893, ten years from 1893 to 1953, and five years since 1953. *See Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259; *Violet v. Martin*, 62 Mont. 335, 342, 205 P. 221, 223 (1922).

17

## STANDARD OF REVIEW

¶24 We review summary judgment rulings de novo, applying the same criteria as did the district court under M. R. Civ. P. 56. *Shattuck v. Kalispell Regl. Med. Ctr., Inc.*, 2011 MT 229, ¶ 8, 362 Mont. 100, ___ P.3d ___. In the present case, there is no genuine issue as to any material fact related to YR's claim of easement by necessity. The only question is whether Meriwether was entitled to judgment as a matter of law on those facts.

## DISCUSSION

¶25 An easement may be created by an instrument in writing, by operation of law, or by prescription. *Blazer v. Wall*, 2008 MT 145, ¶ 26, 343 Mont. 173, 183 P.3d 84; *see also Richter v. Rose*, 1998 MT 165, 289 Mont. 379, 962 P.2d 583 (discussing easements created by condemnation or by common law dedication). The present case concerns an alleged easement created by operation of law—more specifically, an easement by implication. There are two types of "implied easements": easements implied from necessity and easements implied from existing use. *Wolf v. Owens*, 2007 MT 302, ¶ 16, 340 Mont. 74, 172 P.3d 124. As noted, YR claims an easement by necessity.

¶26 Concisely stated, there are two essential elements of an easement by necessity: unity of ownership and strict necessity, both of which the proponent of the easement must prove by clear and convincing evidence. *Frame v. Huber*, 2010 MT 71, ¶ 11, 355 Mont. 515, 231 P.3d 589. Yet, while these two elements might seem relatively straightforward, YR and Meriwether have argued totally divergent interpretations of each in this case.

¶27 For starters, the parties disagree regarding the point in time at which unity of title should be analyzed. In Meriwether's view, that point is June 1919 when the United

States issued Raymond Becker his patent for the west side of Section 22 and thereby established the parcel of land presently owned by YR. Proceeding on this premise, Meriwether argues that the "unity of title" element fails because the United States, at that time (i.e., in June 1919), did not own two of the alleged servient properties (Sections 11 and 15) in common ownership with the alleged dominant property (Section 22).[10] This was the analysis adopted by the District Court in its order. YR, on the other hand, argues that unity of title is satisfied because the United States owned all of these sections in common ownership until title to the odd-numbered sections transferred to Northern Pacific, at which point Section 22 became landlocked.

¶28 The parties also differ as to the "strict necessity" element. Meriwether argues that, even if unity of title is considered as of the date when title transferred to Northern Pacific, YR has failed to show that a public road could be accessed, at that time, from Section 22 by crossing Sections 11 and 15. In this connection, Meriwether points out that a way of necessity may exist only across land that had access to a public road when the property was divided. *See Watson v. Dundas*, 2006 MT 104, ¶ 33, 332 Mont. 164, 136 P.3d 973. Meriwether contends that Northern Pacific's title to the odd-numbered sections "related back to" and "vested in" 1864, when Congress passed the Northern Pacific Act. Meriwether notes, however, that YR has not produced any evidence of a public road through the area in 1864. In the alternative, Meriwether argues that strict necessity could

---

[10] Incidentally, in June 1919, the United States still owned the relevant parts of the even-numbered sections over which YR's alleged easement passes—namely, the southeast quarter of Section 10 and the western side of Section 14. Based on homestead entries, the United States issued patents for the southeast quarter of Section 10 in 1921 and for the north and south halves of Section 14 in 1920.

not have existed because the United States had the power to condemn an access road for the benefit of Section 22. YR, on the other hand, argues that Northern Pacific did not take title until the patents were issued in 1896. YR points out that, by this time, there in fact was a public road running east-west across Sections 9, 10, 11, 12, and 13, which could have been accessed from Section 22. This road is labeled "Road to Tongue River" on the 1877 General Land Office survey, an excerpt of which is displayed below as Diagram VI. As for Meriwether's condemnation argument, YR asserts that common ownership by the United States does not defeat the necessity requirement.

**DIAGRAM VI**



¶29 YR's and Meriwether's arguments reflect some confusion regarding the rules for implying easements by necessity. Moreover, although the issue has arisen in some of our

20

prior cases, we have not squarely considered such easements in the specific context of federal checkerboard land grants to the railroads.[11] It is useful, therefore, to discuss the doctrine of implied easements in further detail before addressing the parties' arguments.

### Implied Easements

¶30 As noted, we recognize two types of implied easements: easements by necessity and easements by existing use. Easements by necessity are typically implied to provide access to a landlocked parcel, while easements by existing use are based on a landowner's prior use of part of his property (the quasi-servient tenement) for the benefit of another part of his property (the quasi-dominant tenement).[12] Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 4:2, 4-3 to 4-4 (Thomson Reuters 2011) (hereinafter, "Bruce & Ely"). For an easement by necessity to arise, there must be unity of ownership, severance, and strict necessity (i.e., no practical access to a public road from the landlocked parcel except across the remaining land of the grantor). Also, the necessity must exist at the time the unified tracts are severed and at the time of exercise of the easement. *Watson*, ¶¶ 32-33. For an easement by existing use to arise,

---

[11] The issue arose in *State v. Cronin*, 179 Mont. 481, 587 P.2d 395 (1978), and *Leisz v. Avista Corp.*, 2007 MT 347, 340 Mont. 294, 174 P.3d 481. But in both cases, we resolved the question on other grounds. *See Cronin*, 179 Mont. at 487-88, 587 P.2d at 399-400; *Leisz*, ¶¶ 45-48. The issue also arose in *Herrin v. Sieben*, 46 Mont. 226, 127 P. 323 (1912). *Herrin*, however, involved the question whether the defendants could move their sheep across the plaintiff's odd-numbered sections (acquired from Northern Pacific) in order to graze the sheep on even-numbered public lots. The *Herrin* decision relied on *Buford v. Houtz*, 133 U.S. 320, 10 S. Ct. 305 (1890), and thus is distinguishable from the present situation involving a claimed right-of-way for ingress and egress. *See Leo Sheep*, 440 U.S. at 687 n. 24, 99 S. Ct. at 1413 n. 24 (distinguishing *Buford*).

[12] An easement implied from existing use is sometimes called a "quasi-easement" before the property is divided, because a person cannot hold an easement in her own land. *Albert G. Hoyem Trust v. Galt*, 1998 MT 300, ¶ 22, 292 Mont. 56, 968 P.2d 1135.

there must be unity of ownership, severance, and an apparent, continuous, and reasonably necessary use of the quasi-servient tenement for the beneficial use and enjoyment of the quasi-dominant tenement. Also, the parties must have intended the use to continue after the severance. *Waters v. Blagg*, 2008 MT 451, ¶ 14, 348 Mont. 48, 202 P.3d 110.

¶31   There are two principal rationales underlying implied easements: the inferred intent theory and the public policy theory. *See* Bruce & Ely, § 4:5, 4-11 to 4-13, § 4:15, 4-61 to 4-62; Gerald Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes* § 3:09(c), (d) 46-49 (2d ed., Juris Publg. 2004) (hereinafter, "Korngold"); *Restatement (Third) of Property: Servitudes* § 2.15 cmt. a (2000). As to the inferred intent theory, it has been said that

> where the owner of a single area of land conveys away part of it, the circumstances attending the conveyance may themselves, without aid of language in the deed, and indeed sometimes in spite of such language, cause an easement to arise as between the two parcels thus created—not only in favor of the parcel granted ("implied grant") but also in favor of the one remaining in the ownership of the grantor ("implied reservation"). The basis of the doctrine is that the law reads into the instrument that which the circumstances show both grantor and grantee must have intended, had they given the obvious facts of the transaction proper consideration.

*Mitchell v. Castellaw*, 246 S.W.2d 163, 167 (Tex. 1952). We have cited the inferred intent theory in a number of cases. *See e.g. Graham v. Mack*, 216 Mont. 165, 173-74, 699 P.2d 590, 595 (1984) ("Easements by implication arise when it is necessary to effect a presumed intent on the part of parties to a deed."); *Woods v. Houle*, 235 Mont. 158, 162, 766 P.2d 250, 253 (1988) ("Implied easements must rest upon an implied intent of the parties gathered from the circumstances surrounding the conveyance."). We have reasoned that "the owner of a tract of land would not sell parts of the land so as to isolate

and landlock a remaining portion of it without having intended to reserve a way of access to the parcel over the lands being severed." *Frame*, ¶ 9. Conversely, it also may be presumed that a purchaser would not buy the inside parcel if a way of access to it is not granted over the outside (non-landlocked) parcel. In this regard, we have recognized the maxim that the grant of a particular interest in property tacitly carries with it those incidents without which the grant would be of no avail. *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 37, 352 Mont. 212, 215 P.3d 675; *see also* § 1-3-213, MCA ("One who grants a thing is presumed to grant also whatever is essential to its use.").

¶32 The public policy theory, on the other hand, is premised on the view that "lands should not be rendered unfit for occupancy or successful cultivation by a lack of access." *Bob Daniels and Sons v. Weaver*, 681 P.2d 1010, 1017 (Idaho App. 1984) (internal quotation marks omitted). We have cited this theory as well, observing that there is "a public policy against isolating tracts of land and thereby minimizing their utility." *Frame*, ¶ 10; *accord Big Sky Hidden Village Owners Assn., Inc. v. Hidden Village, Inc.*, 276 Mont. 268, 277, 915 P.2d 845, 850 (1996).

¶33 Yet, although our cases have referred to this public policy, we have never implied an easement based solely on the notion that a tract of land should not be isolated. To the contrary, we have stated that implied easements "have never been intended to provide access across the land of others to benefit any and all landlocked property." *Frame*, ¶ 10. We have emphasized that implied easements are considered with "extreme caution" and that courts are "reluctant" to find such easements for the reason that they deprive the servient landowner of property rights by imposing a servitude through mere implication

23

and without any compensation. *Graham*, 216 Mont. at 174, 699 P.2d at 596; *Woods*, 235 Mont. at 162, 766 P.2d at 253; *Wangen v. Kecskes*, 256 Mont. 165, 169, 845 P.2d 721, 724 (1993); *Frame*, ¶ 11; *Ashby v. Maechling*, 2010 MT 80, ¶ 19, 356 Mont. 68, 229 P.3d 1210. In this regard, it should be noted that recognition of implied easements "rests upon exceptions to the rule that written instruments speak for themselves. Because implied easements are in derogation of this rule, they are not favored by the courts." *Cordwell v. Smith*, 665 P.2d 1081, 1087 (Idaho App. 1983); *see also* Korngold, § 3:09(a), 44-45 (implying an easement "creat[es] a new interest that is not reflected in the parties' written understanding" and runs the risk of "reducing the value of the servient lot and increasing the value of the dominant in a manner not contemplated by the parties"; implied easements also have the potential "to make title examinations unreliable or titles unstable"). Furthermore, "the imposition of an easement for public policy reasons can raise questions of compensation. Compensation problems are avoided by viewing the common grantor of the two estates, rather than governmental policy, as the source of the burden upon the servient tenement." *Hurlocker v. Medina*, 878 P.2d 348, 352 (N.M. App. 1994) (citation omitted).

¶34 In a sense, then, it may be said that the public policy favoring access to property serves as an underlying justification for implying an easement where the parties failed to address the issue themselves in the transaction documents, but that such implications are limited to narrow situations: the doctrine applies only to the transaction (i.e., severance) which created the access issue in the first place, and where the parties' intent to include an easement may reasonably be inferred from the circumstances. *See e.g. Murphy v.*

*Burch*, 205 P.3d 289, 293-94 (Cal. 2009) (explaining that while easements by necessity are grounded in public policy, "the common law doctrine does not exist to ensure a right of access to any and all landlocked property; rather, the doctrine is properly applied only when the circumstances establish that an access easement was intended at the time of the common owner's conveyance"). This focus on presumed intent is, in fact, reflected in the rules for implying easements.

¶35  With an easement by necessity, the alleged dominant and servient tenements must have been held in common ownership—either as a single tract of land or as contiguous tracts of land—and the property held in common ownership must have been severed (i.e., part of it transferred to another party) in such a way that a portion of the property became landlocked. *Frame*, ¶ 12; *see also Thompson on Real Property* vol. 7, § 60.03(b)(5)(iii), 506 (2d Thomas ed., Matthew Bender 2006) ("[A]n easement by necessity cannot be created unless the dominant and servient tenements were originally one piece of property."); *Campbell v. Summit Plaza Assocs.*, 192 P.3d 465, 472 (Colo. App. 2008) (the unity requirement is satisfied if the grantor owns separate but contiguous parcels before conveying one of them); *Hurlocker*, 878 P.2d at 350-51 (it is not required that the dominant and servient estates be carved out of a previously undivided parcel; it is sufficient if the estates were contiguous and had the same owner); Bruce & Ely, § 4:8, 4-27 to 4-28, § 4:21, 4-80 (an implied easement also may arise when the common owner simultaneously transfers the dominant estate to one party and the servient estate to another). This division of the unified property by the common owner, so that part of it retains access to a public road while the other part is cut off, triggers the presumption that

25

the common owner intended to grant or reserve an easement over the non-landlocked parcel for the benefit of the landlocked one. Bruce & Ely, § 4:7, 4-18 ("A landowner who divides land in such a way that a portion of the property becomes landlocked is presumed to have intended to provide access to the landlocked parcel."). The easement may arise only at the time of severance, because the common owner may grant or reserve an easement only over her own property, not over the neighboring or intervening property of a third party. *Schmid v. McDowell*, 199 Mont. 233, 238, 649 P.2d 431, 433 (1982) (a way of necessity can arise only out of the land granted or reserved by the grantor and never out of the land of a third party or a stranger to the title); *Frame*, ¶¶ 16-18 (unity of ownership cannot exist where a third party owns property which separates the alleged dominant tenement from the alleged servient tenement at the time of severance).

¶36    Similarly, with an easement by existing use, the alleged dominant and servient tenements must have been held in common ownership, and there must have been, at the time of severance, an apparent, continuous, and reasonably necessary use of the servient part of the property for the benefit of the dominant part. *Waters*, ¶ 14. It is from the existence of this quasi-easement that it may be inferred that the parties intended the use to continue, and thus the quasi-easement ripens into a true easement upon severance. Bruce & Ely, § 4:15, 4-60 ("Easements may be implied from a landowner's use of part of the landowner's property . . . for the benefit of another part . . . .").

### Unity of Title

¶37    It can be seen from these principles that the District Court's analysis with respect to unity of title (the same approach that Meriwether argues on appeal) is incorrect. The

26

District Court concluded that the relevant severance occurred in 1919 when Raymond Becker received his patent from the United States for the western side of Section 22. The court based this conclusion on the view that this "is the date when the parcel owned today by YR was created." The court then reasoned that because the United States did not also own the servient parcels (the neighboring odd-numbered sections) at that time, there was no common ownership at the time of severance and YR's claim, therefore, failed.

¶38 The relevant severance for purposes of an easement by necessity, however, is the severance that creates the necessity for an easement. *Restatement (Third) of Property: Servitudes* § 2.15 cmt. c ("[Easements by necessity] will be implied only in conveyances that cause the necessity to arise."). This occurs when the alleged dominant and servient tenements are severed from common ownership and the dominant estate is left isolated as a result. *Frame*, ¶ 12 ("Unity of ownership is established if the dominant and servient parcels were owned by one person or entity immediately prior to the severance that gives rise to necessity."); Bruce & Ely, § 4:7, 4-26 ("Unity of title must have produced the circumstances that led to the isolation of the dominant estate. In other words, common ownership must have immediately preceded the severance that created the necessity." (footnote omitted)); *Thompson on Real Property* § 60.03(b)(5)(iii), 507 ("For an easement by necessity to be implied, the severance creating the dominant and servient tenement must have created a situation in which there was no access for the dominant tenement to some public roadway."). Hence, if the alleged dominant and servient parcels were never held in common ownership, or if the particular severance did not leave the dominant estate isolated, then the inferred intent theory fails and the doctrine of easement

27

by necessity simply has no application. But, if the alleged dominant and servient parcels were held in common ownership, and if a severance of that unified property resulted in a landlocked parcel and a non-landlocked parcel, then it is inferred that the common owner intended at the time of severance to grant or reserve an easement over the non-landlocked parcel for the benefit of the landlocked one. (Of course, as discussed in the next section, this inference may fail if "strict necessity" does not actually exist or if there is proof of contrary intent on the part of the parties.)

¶39   In June 1919, when the United States issued Raymond a patent for the western side of Section 22 and retained the eastern side of Section 22 (recall that the patent for the eastern side was issued to Eugene in July 1919), the entirety of Section 22 was already landlocked.[13]   The severance that created YR's property, therefore, did not *create* the necessity for an easement over the neighboring odd-numbered sections. Indeed, the access issue already existed due to the checkerboard land grant to Northern Pacific several decades earlier. In this respect, the District Court correctly concluded that an easement by necessity could not have arisen out of the issuance of Raymond's patent: at that point, the United States no longer owned Sections 11 and 15 (the alleged servient parcels), and thus there is no basis for inferring that the United States intended to reserve an easement by necessity over those sections for Section 22's benefit.

_____

[13] It should be noted that Raymond's homestead entry in 1915 had the effect of withdrawing his land from the public domain, and the patent issued in 1919 related back to the date of Raymond's 1915 entry. *See U.S. v. Etcheverry*, 230 F.2d 193, 196-97 (10th Cir. 1956); *Pierce v. Chicago, Milwaukee & Puget Sound Ry. Co.*, 52 Mont. 110, 117-18, 156 P. 127, 128-29 (1916). Nevertheless, for purposes of this case, it makes no difference whether the west side of Section 22 is considered "severed" in 1919 or in 1915. Section 22 was already landlocked either way.

¶40    The District Court erred, however, in not considering the severance that did create the alleged necessity for an easement. The District Court rejected YR's argument that unity of title existed up to the point when the United States transferred its interest in the odd-numbered sections to Northern Pacific. The District Court expressed concern that if it "determined that the land was severed at the time that the Railroads were granted lands, that could conceivably impact thousands of landholders in Montana alone." Yet, while this is a legitimate concern (as indicated by the Supreme Court in *Leo Sheep*, discussed in further detail below), it is not pertinent to the unity of title question.

¶41    Determining when the relevant severance occurred is more complicated in this case due to the "*in praesenti*" nature of the grant to Northern Pacific. As explained above (*see* ¶¶ 12, 14, *supra*), title vested in 1864 as of the date of the grant. But the grant was in the nature of a float, and the company's title did not attach to any specific sections until they were capable of identification. Meanwhile, the ordinary working of the land system continued within the supposed limits of the grant, the same as if the grant had not been made. Thus, no "necessity" for an implied easement yet existed. Once the government survey was completed and the railroad line definitely located, however, the company's title attached to the non-mineral odd-numbered sections that had not already been appropriated to other purposes. Only if the ultimate configuration of Northern Pacific's ownership left a given even-numbered section landlocked could it then be claimed that a necessity existed. Accordingly, the date of severance for purposes of our analysis is the date when the relevant odd-numbered sections subject to the 1864 grant were identified and an adjacent even-numbered section was then found to be landlocked.

¶42    Here, the survey was completed in 1877, and the definite location of the railroad line was fixed in 1881. Prior to this point, Sections 10, 11, 14, 15, 22, 23, and 27 were part of the public domain. This is the only time that the alleged dominant and servient tenements were held in any sort of "common ownership" (by the United States) as a unified tract of land. This common ownership was severed when Northern Pacific's title attached to the odd-numbered sections in 1881. This severance created a situation where Section 22 no longer had access to a public roadway; in other words, Section 22 became isolated when Northern Pacific's title attached in 1881. Thus, the severance caused by the checkerboard land grant is the severance that gave rise to the alleged necessity for an easement over Sections 11 and 15. Common ownership by the United States immediately preceded the severance that created the necessity.

¶43    Meriwether relies heavily on *Kullick v. Skyline Homeowners Assn., Inc.*, 2003 MT 137, 316 Mont. 146, 69 P.3d 225, for the proposition that common ownership had to exist "at the time of the grant" that created YR's property—i.e., in 1919, when the patent was issued to Raymond. There is language in ¶¶ 25-27 of *Kullick* that could be interpreted in this way; however, that is not the holding of *Kullick*, and *Kullick* in fact illustrates the point made above regarding unity of title. In 1973, the Mildenbergers purchased several hundred acres of land. They then sold a portion of that property to two individuals who created the Skyline Development. *Kullick*, ¶ 7. Importantly, the property retained by the Mildenbergers was not landlocked as a result of this severance. *Kullick*, ¶¶ 9-10. Still later, in 1991, the Mildenbergers sold 13 acres of their remaining property to the Kullicks. *Kullick*, ¶ 8. Thereafter, the Kullicks claimed an easement by necessity over

30

the Skyline Development land. *Kullick*, ¶ 11. Yet, the necessity for an easement benefitting the Kullicks' 13 acres did not arise until the 1991 sale, at which point the Mildenbergers no longer owned the alleged servient tenement (the Skyline Development land). Thus, the Kullicks could not establish unity of title for an easement over that land.[14] *Kullick*, ¶ 30. Instead, the Kullicks might have been able to show an easement by necessity over the remaining land of the Mildenbergers after the 1991 sale, since it was that severance which created the necessity. In any event, our statement in *Kullick*, ¶ 27, that an easement by necessity requires unity of ownership of the dominant and servient tenements "*at the time of the grant*" (emphasis in original) was correct, but incomplete. Such unity of ownership must exist "at the time of the grant *that creates the necessity for the alleged easement*."

¶44 One further point should be noted here. In making its arguments, Meriwether overlooks the fact that when a dominant estate is transferred in separate parcels to different persons, each grantee acquires a right to use easements appurtenant to the dominant estate, provided the easements can be enjoyed as to the separate parcels without any additional burden on the servient estate. *Mularoni v. Bing*, 2001 MT 215, ¶ 27, 306 Mont. 405, 34 P.3d 497. It is immaterial, therefore, that YR's property did not yet exist when the necessity arose. If the severance due to the checkerboard land grant resulted in

---

[14] The same principle can be seen in *Graham*, which we discussed in *Kullick*, ¶ 26. At the time of the first severance, the grantor (Collingson) disclaimed any intent to access his retained land by crossing the land of his grantee (Graham). *Graham*, 216 Mont. at 175, 699 P.2d at 596. The alleged necessity for an easement did not arise until a second severance wherein Mack purchased a portion of Collingson's retained land. Mack then asserted a right to cross Graham's land. By that time, however, when the necessity arose, unity of title no longer existed. *Graham*, 216 Mont. at 176, 699 P.2d at 597.

31

an easement by necessity benefitting Section 22, then it is axiomatic that this easement benefitted Raymond and Eugene when their separate tracts were carved out of Section 22 in 1919. *Mularoni*, ¶ 27; *Burleson v. Kinsey-Cartwright*, 2000 MT 278, ¶ 18, 302 Mont. 141, 13 P.3d 384 (an easement attaches to property when the dominant tenement is partitioned or subdivided, and is apportioned according to the division of the dominant tenement); *Leichtfuss v. Dabney*, 2005 MT 271, ¶¶ 48-55, 329 Mont. 129, 122 P.3d 1220.

### Strict Necessity and Contrary Intent

¶45    Having concluded that unity of title exists, we address whether "strict necessity" is met. We also must consider whether any of the circumstances surrounding the severance negate the inference that the United States intended to reserve an easement.

¶46    "An easement of necessity is extinguished when the necessity on which it is based ends." Bruce & Ely, § 10:9, 10-21; *accord Restatement (Third) of Property: Servitudes* § 4.3 cmt. b ("Because necessity is the justification for the servitude, its duration is limited to the period of necessity." (citation omitted)). Thus, we have said repeatedly that "[s]trict necessity must exist at the time the tracts are severed from the original ownership *and* at the time the easement is exercised." *Frame*, ¶ 14 (emphasis in original); *accord Ashby*, ¶ 22; *Watson*, ¶ 32; *Loomis v. Luraski*, 2001 MT 223, ¶ 50, 306 Mont. 478, 36 P.3d 862; *see also* Bruce & Ely, § 4:12, 4-42 to 4-43 ("Continuing necessity is required because, without it, there is no public policy basis for the easement.").[15] The element of

---

[15] Our analysis in *Kelly v. Burlington N. R.R. Co.*, 279 Mont. 238, 245, 927 P.2d 4, 8 (1996), could be interpreted as holding that strict necessity need exist *only* at the time of severance. In that part of the *Kelly* opinion, we rejected as "irrelevant" the servient landowners' argument regarding the dominant landowners' *present* easement options.

strict necessity requires that there be no practical access to a public road from the landlocked parcel except across lands that were formerly in common ownership. *Kelly*, 279 Mont. at 243-44, 927 P.2d at 7; *Frame*, ¶ 14. Here, strict necessity presently exists because there is no practical access to a public road from YR's property except across lands that were formerly in common ownership. The difficult question is whether strict necessity existed at the time the tracts were severed from common ownership.

¶47 A developed way of access to the landlocked parcel need not actually exist at the time of severance. Indeed, this is the fundamental distinction between an easement by necessity and an easement by existing use. *Frame*, ¶ 14; *Graham*, 216 Mont. at 175, 699 P.2d at 596; *Schmid*, 199 Mont. at 237, 649 P.2d at 432; Bruce & Ely, § 4:2, 4-6. The location and dimensions of a way of necessity are dictated by the necessity on which the easement is based and what is reasonable under the circumstances. Bruce & Ely, § 7:10, 7-25; *see e.g. Ashby*, ¶¶ 36-44 (discussing the scope of an easement by necessity). But a way of necessity may be implied only across land that had access to a public road when the property was divided. *Watson*, ¶ 33; *see also* Bruce & Ely, § 4:8, 4-30 (if the servient estate was landlocked at the time of severance, then the purpose of the doctrine—to provide the dominant estate access to the outside world—cannot be fulfilled).

¶48 As noted, Meriwether makes much of the fact that YR has not presented evidence of a public road, accessible by crossing Sections 11 and 15, in 1864. Meriwether is mistaken, however, in its assumption that a public road must be shown to exist in 1864.

---

Our reasoning was correct in the context of the issue presented in *Kelly*, but *Kelly* should not be misconstrued as stating a general rule that strict necessity at the time the easement is exercised is "irrelevant." *Kelly* is so clarified, on this specific point.

The necessity for an implied easement did not arise until 1881, when it was determined that Sections 11, 15, 23, and 27 were subject to the 1864 grant, Northern Pacific's title attached to those sections, and Section 22 was found to be landlocked. *See* ¶¶ 41-42, *supra*. By that time, there was a public road across Sections 9, 10, 11, 12, and 13, as depicted on the 1877 survey provided by YR. *See* Diagram VI, ¶ 28, *supra*.

¶49 On the other hand, there is some validity in Meriwether's alternative argument that strict necessity could not have existed because the United States had the power to condemn an access road for the benefit of Section 22. As Meriwether and YR both acknowledge, this question surfaced in *Ashby*, but we did not render a holding because the parties had not properly preserved and briefed the issue. *See Ashby*, ¶ 25 (opinion of the Court), ¶ 49 (Leaphart & Rice, JJ., specially concurring), ¶¶ 50-71 (Nelson, J., dissenting). Moreover, *Ashby* involved property held in common ownership by a subdivision of state government (specifically, Ravalli County), not by the federal government, and thus *Ashby* is distinguishable on that ground.

¶50 *Leo Sheep*, on the other hand, specifically addressed the point now argued by Meriwether. As discussed, *Leo Sheep* involved a checkerboard land grant like the present case: odd-numbered sections were granted to Union Pacific; even-numbered sections were reserved by the United States. Leo Sheep Co. and Palm Livestock Co. were Union Pacific's successors in fee to specific odd-numbered sections of land in Wyoming. When a dispute arose over the public's ability to access a nearby reservoir used for fishing and hunting, the federal government cleared a dirt road extending from a local county road to the reservoir across both public domain lands and fee lands of Leo Sheep. *Leo Sheep*,

440 U.S. at 677-78, 99 S. Ct. at 1409. Leo Sheep and Palm Livestock then filed an action to quiet title against the United States. The Court of Appeals for the Tenth Circuit concluded that when Congress granted land to Union Pacific, it implicitly reserved an easement to pass over the odd-numbered sections in order to reach the even-numbered sections that were held by the Government. Because this holding affected property rights in 150 million acres of land in the western United States, the Supreme Court granted certiorari and reversed. *Leo Sheep*, 440 U.S. at 678, 99 S. Ct. at 1409.

¶51 The Union Pacific Act included a few specific reservations to the checkerboard grant, such as mineral lands and land sold, reserved, or otherwise disposed of by the United States, but it did not contain an express reservation of the easement asserted by the Government. Thus, the Government argued an implicit reservation of an easement by necessity. *Leo Sheep*, 440 U.S. at 678-79, 99 S. Ct. at 1409. The Supreme Court rejected this theory, however, on the ground that the claimed easement "is not actually a matter of necessity in this case because the Government has the power of eminent domain." *Leo Sheep*, 440 U.S. at 679-80, 99 S. Ct. at 1410. The Court noted that "[j]urisdictions have generally seen eminent domain and easements by necessity as alternative ways to effect the same result." *Leo Sheep*, 440 U.S. at 680, 99 S. Ct. at 1410. Then, using language particularly apt to the question at hand, the Supreme Court stated:

> The applicability of the doctrine of easement by necessity in this case is, therefore, somewhat strained, and ultimately of little significance. The pertinent inquiry in this case is the intent of Congress when it granted land to the Union Pacific in 1862. The 1862 Act specifically listed reservations to the grant, and we do not find the tenuous relevance of the common-law doctrine of ways of necessity sufficient to overcome the inference prompted by the omission of any reference to the reserved right

35

asserted by the Government in this case. It is possible that Congress gave the problem of access little thought; but it is at least as likely that the thought which was given focused on negotiation, reciprocity considerations, and the power of eminent domain as obvious devices for ameliorating disputes. So both as a matter of common-law doctrine and as a matter of construing congressional intent, we are unwilling to imply rights-of-way, with the substantial impact that such implication would have on property rights granted over 100 years ago, in the absence of a stronger case for their implication than the Government makes here.

*Leo Sheep*, 440 U.S. at 680-82, 99 S. Ct. at 1410-11 (footnote omitted).[16] Further along in its opinion, the Supreme Court also noted:

It is certainly true that the problem we confront today was not a matter of great concern during the time the 1862 railroad grants were made. The order of the day was the open range—barbed wire had not made its presence felt—and the type of incursions on private property necessary to reach public land was not such an interference that litigation would serve any motive other than spite. Congress obviously believed that when development came, it would occur in a parallel fashion on adjoining public and private lands and that the process of subdivision, organization of a polity, and the ordinary pressures of commercial and social intercourse would work itself into a pattern of access roads.

*Leo Sheep*, 440 U.S. at 685-86, 99 S. Ct. at 1412-13 (footnote omitted).

¶52    In *Murphy*, the California Supreme Court concluded that "conveyances involving a sovereign as the common owner typically do not give rise to implied *reservations* of easements or other property interests in conveyed land." 205 P.3d at 294 (emphasis in

---

[16] In *Herrin v. Sieben*, 46 Mont. 226, 235, 127 P. 323, 328 (1912), this Court reasoned that because it is impossible to gain access to the even-numbered sections belonging to the government except by going over some portion of the odd-numbered sections granted to Northern Pacific, "[i]t must follow that there is an implied reservation by the federal government of a way of necessity, not only in favor of the government itself for access to these sections for any use to which it may wish to devote them, but also in favor of the private citizens who wish to go upon them for the purpose of making settlements thereon, or to cut timber when they may lawfully do so, or to explore them for mineral deposits, or, finally, to use them for grazing purposes." Obviously, such a broad holding is no longer valid in light of *Leo Sheep*.

original) (citing, among others, *Leo Sheep*, 440 U.S. at 679-81, 99 S. Ct. 1403). The court declined, however, to "impose a categorical bar to all easement-by-necessity claims tracing common ownership to the federal government." *Murphy*, 205 P.3d at 295. Instead, given "the special considerations" that arise when land patents are at issue—not the least of which is the special need for "certainty and predictability" where land titles are concerned—the court reasoned that "when a claimant traces common ownership back to the federal government and seeks to establish an implied reservation of an access right-of-way, the intent of Congress is paramount and the government's power of eminent domain also bears significance." *Murphy*, 205 P.3d at 294, 295 (citing *Leo Sheep*, 440 U.S. at 679-82, 99 S. Ct. 1403). Following this logic, the court held:

> Given the unique historical and legal nature of land patents, extreme caution must be exercised in determining whether the circumstances surrounding a government land grant are sufficient to overcome the inference prompted by the omission of an express reference to a reserved right of access. In such cases, the easement claimant bears the burden of producing evidence on the issues regarding the government's intent to reserve an easement and the government's lack of power to condemn.

*Murphy*, 205 P.3d at 295-96 (citation omitted); *see also Granite Beach Holdings, LLC v. State*, 11 P.3d 847, 854 (Wash. App. Div. 1 2000) (rejecting the claimed easement by necessity because the claimants did not show that Congress intended to reserve an easement to the United States under the railroad grants or that the United States lacked authority to condemn access if it deemed doing so to be necessary).

¶53 The approach adopted by the Supreme Court of California is consistent with the reasoning of *Leo Sheep*, which focused both on the lack of strict necessity (due to the power of eminent domain) and, most significantly, on the intent of Congress. We will

37

utilize the same approach when analyzing an alleged easement by necessity where, as here, the claimant traces common ownership of the dominant and servient parcels back to the federal government and the necessity for the easement arose when those parcels were severed from the federal government's common ownership. The claimant bears the burden of producing evidence on the issues regarding the government's intent to reserve an easement and the government's lack of power to condemn an easement.

¶54 In the present case, Meriwether suggests that, before issuing Raymond his patent, the United States could have condemned an easement for the benefit of Section 22, thus negating the notion of "strict necessity." YR, for its part, has not endeavored to show otherwise. But even more problematic for YR is the evident intent of the United States *not* to reserve the easement YR claims. Like the Union Pacific Act, the Northern Pacific Act includes a few specific reservations to the checkerboard grant, such as mineral lands and land sold, reserved, or otherwise disposed of by the United States prior to the date of definite location of the railroad line. However, there is not an express reservation of an ingress/egress roadway across every odd-numbered section granted to Northern Pacific in favor of every even-numbered section reserved by the United States. YR asserts that the United States "contemplated" homesteading for such lands, yet YR points to no language in the Northern Pacific Act (or in the Homestead Act) granting or reserving the right to cross Northern Pacific's property for homesteading purposes. In fact, the Northern Pacific Act recognizes that there may be homestead entries upon the lands within the supposed limits of the grant *before* the railroad line is definitely located and Northern Pacific's title attaches. But there is no reservation of a right to cross sections to which the

company's title has attached. As the Supreme Court indicated, the doctrine of easements by necessity is not "sufficient to overcome the inference prompted by the omission of any reference [in the Northern Pacific Act] to the reserved right asserted by [YR] in this case." *Leo Sheep*, 440 U.S. at 681, 99 S. Ct. at 1410. Given the existence of explicit exceptions in the 1864 Act, we may not "add to this list by divining some 'implicit' congressional intent." *Leo Sheep*, 440 U.S. at 679, 99 S. Ct. at 1409. "It is possible that Congress gave the problem of access little thought; but it is at least as likely that the thought which was given focused on negotiation, reciprocity considerations, and the power of eminent domain as obvious devices for ameliorating disputes." *Leo Sheep*, 440 U.S. at 681, 99 S. Ct. at 1410.

¶55    Thus, the checkerboard land grant to Northern Pacific presents an instance where the inferred intent to create an easement fails. As stated above, if the alleged dominant and servient parcels were held in common ownership, and if a severance of that unified property resulted in a landlocked parcel and a non-landlocked parcel, then it is inferred that the common owner intended at the time of severance to grant or reserve an easement over the non-landlocked parcel for the benefit of the landlocked one. "The implication will not be made, however, where it is shown to be contrary to the parties' intentions." *Murphy*, 205 P.3d at 293; *see also* Bruce & Ely, § 4:13, 4-45 ("[T]he inference of intent to create an easement of necessity that arises under certain previously discussed circumstances may be overcome by proof that the parties in fact intended that no such easement be created."). We are particularly reluctant to imply an easement where, as here, not only is the inference of intent to reserve an easement extremely tenuous, but the

ramifications of such an implication are quite significant. To conclude that the United States impliedly reserved a right-of-way for ingress and egress over all of Northern Pacific's odd-numbered sections would result in innumerable easements by necessity and could undermine the security of thousands of land titles.

¶56 As a final matter, YR cites *Mont. Wilderness Assn. v. U.S. Forest Serv.*, 496 F. Supp. 880 (D. Mont. 1980), and *Fitzgerald Living Trust v. U.S.*, 460 F.3d 1259 (9th Cir. 2006), for the proposition that the necessity requirement is not defeated because of the United States' ownership. Both cases, however, concerned implied easements by necessity *against* the United States, not *in favor of* the United States (as here). This is a critical point, which YR overlooks. *Leo Sheep* made it clear that we may not infer some implicit congressional intent to *reserve* easements over odd-numbered sections for the benefit of the federal government. But this does not preclude an inference that Congress intended to *grant* easements over even-numbered sections for the benefit of the railroad company. And that is precisely the analysis the court undertook in *Mont. Wilderness*. After finding the essential elements of an easement by necessity met, the court stated: "While the prerequisites of the common law easement by necessity doctrine are satisfied in this case, that does not of itself establish the easement. This court must look to the intent of the parties to the conveyance and the purposes of the conveyance. In this case, that is ascertained by looking to the purposes of the 1864 land grant." *Mont. Wilderness*, 496 F. Supp. at 885 (citation and footnote omitted). Doing so, the court observed that the overriding purpose of the railroad land grants was to induce private companies to undertake the task of building the transcontinental railroad. Congress granted enormous

40

amounts of land to Northern Pacific because, without the land grants as inducement, the railroads would not have been built. Yet, without access to those lands, they would have been worthless—a barren gift. Therefore, the court reasoned, "it can be assumed that Congress intended that the grantees of the land also be given a right of access to use that land." *Mont. Wilderness*, 496 F. Supp. at 885-86; *see also McFarland v. Kempthorne*, 545 F.3d 1106, 1111 (9th Cir. 2008) ("The doctrine of easement by necessity applies, generally, *against* the United States." (emphasis added) (citing *Mont. Wilderness*, 496 F. Supp. at 885)). The approach of the *Mont. Wilderness* court, focusing as it did on the intent of Congress, is consistent with our approach herein. Contrary to YR's arguments, an implied congressional intent to *grant* a right of access over reserved federal lands does not equate to an implied congressional intent to *reserve* a right of access over the lands Congress has granted.

**CONCLUSION**

¶57 The District Court erred in concluding that unity of title did not exist in this case. Returning to the discussion of implied easements (¶¶ 30-36, *supra*), the "unity of title" requirement was fulfilled because immediately prior to the 1881 severance, the United States owned all of what would become the alleged servient parcels (the odd-numbered sections granted to Northern Pacific under the 1864 Act) over which YR claims an easement, along with what would become the alleged dominant parcel (Section 22), a portion of which YR now owns. In 1881, Sections 11, 15, 23, and 27 became subject to the 1864 grant, Northern Pacific's title attached to those sections, and Section 22 thereby became landlocked, thus giving rise to an ostensible necessity for an implied easement.

41

The easement fails, however, because the United States' power of eminent domain negates the "strict necessity" requirement. Furthermore, the conscious decision by Congress to include specific reservations in the grant to Northern Pacific is evidence that Congress did *not* intend for there to be other, implicit reservations—such as the access easement YR claims in this case. Finally, because implied easements are not favored in the law, we will not ground the creation of such an easement in public policy where, as here, doing so would not only be at odds with federal jurisprudence, but would also have the potential to affect and destabilize thousands of other land titles.

¶58 For these reasons, Meriwether is entitled to judgment as a matter of law on YR's claim of easement by necessity. We will not reverse a district court when it reaches the right result, even if it reached that result for the wrong reason. *Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, 152 P.3d 1275.

¶59 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE